**U.C. LEASING, INC., Appellee,**

v.

**STATE of Oklahoma, ex rel. STATE BOARD OF PUBLIC AFFAIRS; State Department of Public Safety, Oklahoma Law Enforcement Telecommunications Systems Division, Appellants.**

No. 53374.

Supreme Court of Oklahoma.

May 26, 1987.

As Corrected June 4, 1987.

---

Rhodes, Hieronymus, Holloway & Wilson by Page Dobson and William C. McAlister, Oklahoma City, for appellee.

Jan Eric Cartwright, Atty. Gen., Johnny J. Akins, Asst. Atty. Gen., Oklahoma City, for appellants.

1. 74 O.S.1971, § 85.1 et seq.

2. 74 O.S.1971, § 85.2(3).

3. 74 O.S.1971, § 85.4 reads in part as follows: "From and after the effective date of this act, except as provided in Section 12 of this act, every state agency shall acquire all contractual services, supplies, equipment or mate-

**PER CURIAM:**

This appeal is from a judgment awarding damages for breach of a personal property lease to U.C. Leasing, Inc. (Appellee) against the State of Oklahoma ex rel. The State Department of Public Safety, Oklahoma Law Enforcement Telecommunications Systems Division (Appellant) in the sum of $92,812.59 together with prejudgment interest from December 16, 1974, the date of the breach.

The State Department of Public Safety, Oklahoma Law Enforcement Telecommunications Systems Division is the legal successor to Commission on Criminal and Traffic Law Enforcement Systems, a state commission created pursuant to the statutes of the State of Oklahoma.

Appellee as lessor and Appellant's predecessor entered into a lease agreement for the leasing of certain communications switching system equipment. The lease provided for 60 consecutive rental payments during the life of the lease, and further provided a right of acceleration of the lease payments upon the default of the lessee (Appellant).

### I.

In its argument on appeal Appellant first claims that the lease agreement was rendered void because it was not made in procedural conformity with the Oklahoma Central Purchasing Act as constituted at the time of the making of the lease.[1]

There can be no doubt that the lease agreement is subject to the Act since by definition an "acquisition" includes a lease of equipment.[2]

The procedures which must be followed by a "state agency" in the "acquisition" of equipment are explicit.[3]

rials used, consumed or spent by such agency in the performance of its official functions by the presentation of requisitions for such services, supplies, materials or equipment to the Purchasing Division established hereunder. and [sic] no such items or service shall be acquired by any state agency for such use except by the presentation of such requisition

The lease agreement had its origin in a request made by the Oklahoma Criminal and Traffic Law Enforcement Systems [4] to the State Board of Public Affairs which solicited bids under the provisions of 74 O.S.1971, § 85.1 et seq. from prospective bidders for the purchase or lease of a message switching device for a private wire teletypewriter communications network serving the Oklahoma Criminal and Traffic Law Enforcement System to meet the specifications provided with the invitation to bid. On or about August 12, 1970, Computer Control Systems, Inc. (CCS) sub-

and receipt of the items of service so requisitioned through the Purchasing Division...."

§ 85.5 Exclusive authority of Director—Rules and Regulations by Board.

"Subject to the provisions of Section 4, the State Purchasing Director, under the supervision of the State Board of Public Affairs, shall have sole and exclusive authority and responsibility for the acquisition of all materials, supplies, equipment and services acquired, used or consumed by agencies of the State Government. The State Purchasing Director, after consultation with the requesting or purchasing agency, shall have authority to determine the particular brand, model and/or other specific classification of each item or group of materials, supplies, equipment or services to be acquired for such use or consumption, and to draft specifications establishing the requirements for all such purchases under the restrictions hereinafter provided. The State Board of Public Affairs shall have authority and responsibility to promulgate rules and regulations governing, providing for and prescribing:

(1) The time, manner, authentication and form of making requisitions for supplies, materials, equipment and services covered by this act;

(2) Inspection and testing of all supplies, materials and equipment purchased for use or consumption by state agencies and for analyzing and testing any samples or portions thereof, and the manner of such inspections, tests and analyses;

(3) The form and the time and manner of submission of any bids submitted for contracts to furnish any of the items or services affected by this act and the manner of opening and accepting the same, subject to restrictions contained in this act;

(4) The conditions under which written contracts for such purchases are to be required for the acquisitions affected by this act and the conditions under which such acquisitions may be made on an open account basis, subject to restrictions contained in this act, and the conditions and manner of negotiating such contracts;

(5) The conditions under which surplus or other unused materials, supplies or equipment acquired or owned by any state agency may be sold, or traded or transferred to another state agency, or otherwise disposed of and the manner of accomplishing the same;

(6) The conditions under which purchases may be made by state agencies without use of

the procedure required hereunder, and the form and manner of requests for such authority from the State Purchasing Director;

(7) Any preference which may be found feasible to give to items and services produced by state institutions, or within this state, or the United States;

(8) Conditions under which any of the rules and regulations herein authorized may be waived, under the restrictions contained in this act;

(9) The amounts of and deposits on any for the furnishing of items or services affected by this act, and the conditions under which such bond shall be required;

(10) Such storage and storage facilities as may be necessary to accomplish his responsibilities hereunder;

(11) The manner and conditions of delivery, acceptance or rejection, including check of quantities, of any supplies, materials, service or equipment affected by this act;

(12) The form of any estimate, order or other document required to discharge the responsibilities fixed hereunder;

(13) Any other matter or practice which is directly related to his responsibilities hereunder and is reasonably within the scope of his authority as defined by this act. The authority delegated by this section to promulgate rules and regulations shall be construed to authorize any act, practice or requirement for which such regulatory power is delegated, but which is not presently authorized by law."

§ 85.7 Competitive bids—Professional services—Emergency acquisitions—Postage—Split purchases.

"No acquisition or contract shall be made in excess of Five Hundred Dollars ($500.00) without the submission of competitive bids by the State Purchasing Director, and such acquisition or contract shall be awarded to the lowest and best bidder therefor at a specified time and place, which shall be open to the public, with such preference between bidders offering substantially the same products or services at substantially the same prices, as may be set under the authority of Section 5(7) [74 O.S.1961, § 85.5(7)]."

4. The statute under which this agency was created was repealed by 1975 Okla.Sess.Laws, Ch. 324 § 11 effective June 12, 1975, and its assets were transferred to the Department of Public Safety, Law Enforcement Telecommunications Systems Division (Appellant).

mitted a proposal for bid which resulted in a written lease agreement and the State Board of Public Affairs issuing an award of contract for the lease of one message switching device. Thereafter, Appellant negotiated with CCS for additional features and equipment to be added to modify the original system, all of which became a part of the lease agreement. U.C. Leasing, Inc. became a party to the ultimate agreement by purchasing the entire system from CCS in contemplation of the lease agreement.

The only specific shortfall alleged by Appellant in the long list of statutory procedural requirements is a terse excerpt from one of the Appellee's witnesses, Willis Willey, President of U.C. Leasing, Inc., wherein the witness stated in effect that "we did not know any invitations to bid existed, and were not aware of the proposals and specifications that were submitted by Teleswitcher in 1970." However, the evidence was undisputed that "Teleswitcher" was a wholly owned subsidiary of Computer Control Systems, Inc., a party to the lease agreement, and that "Teleswitcher" was merged into Computer Control Systems, Inc. It is uncertain whether Willey in his answer was purporting to speak for himself and unidentified persons associated with either corporation, Computer Control Systems, Inc. or "Teleswitcher," or all of them. But in any event, if the procedural requirements of the Act are in fact met, we do not deem the lessor's ignorance of their existence or of the compliance with them a vitiation of the lease agreement, nor does Appellant point out any prejudice arising therefrom.

This Court indulges in the presumption that the trial court's decision is correct, and decisions will not be reversed on argument of error not supported by authority, if authority is available, unless error is apparent without further research.[5]

## II.

Appellant next contends that the lease before us is in violation of Article 10, § 26 of the Oklahoma Constitution. However, since the governmental contracting party to the lease is neither a "county, city, town, township, school district, or other political corporation, or subdivision of the state" within the meaning of § 26, that section does not apply here.[6] Rather, it is the fiscal authority and restraints of Art. 10, §§ 23 and 25, and of the Oklahoma Budget Law of 1947, as amended, (62 O.S.1971, § 41.1 et seq.) which govern.

The lease agreement before us was entered into on October 15, 1971. It purports to be for a term of 60 months. It also provides: "Time is of the essence of this Agreement * * *. If Lessee shall fail to pay any rental as herein provided when the same is due and payable, * * * the lessor * * * may declare the remaining unpaid installments of rent at once due and payable * * *." Monthly rentals in the sum of $4,465 were due commencing upon written acceptance of the equipment and for 60 consecutive months thereafter. The primary switching unit was in place by October 15, 1971, with a "back-up" unit to be installed later in connection with the lease agreement. The "back-up" unit was accepted on November 17, 1971.

Contained within the lease agreement is the following: "Notwithstanding anything to the contrary contained herein, if the legislative body appropriating funds for Lessee does not allocate funds for the payment of a communications switching system for Oklahoma Criminal and Traffic Law Enforcement, the Lessee will not be obligated to pay the net total of periodic payments remaining on the lease beyond the then current fiscal period. Lessee agrees to notify CCS (Computer Control Systems, Inc.) of such nonallocation in writing at the earliest possible time."

U.C. Leasing learned that the interface connecting with the National Law Enforce-

---

5. *Georgia-Pacific Corp. v. Lumber Products Co.,* Okl., 590 P.2d 661 (1979); *Batts v. Carter,* Okl., 312 P.2d 472, 473 (1957); *Collinson v. Thread-gill,* 122 Okl. 174, 252 P. 827 (1927).

6. *Sheldon v. Grand River Dam Authority,* 182 Okl. 24, 76 P.2d 355 (1935); *Boardman v. Oklahoma City Housing Authority,* Okl., 445 P.2d 412 (1968).

ment Teletype System, one of the components called for in the lease agreement, had never been furnished. Due to changes and technical advancements then existing in connecting systems, the automatic interface called for in the lease agreement would not work. U.C. Leasing thereupon refunded all lease rentals paid by the State for the device and reduced the subsequent monthly payments by the value of the same, without objection by Appellant.

Oklahoma Commission on Criminal and Traffic Law Enforcement Systems notified U.C. Leasing, Inc. on December 16, 1974, of its intent to discontinue lease payments and lease rental payments ceased on that date.

For each year during the lease term the Oklahoma Legislature appropriated Line Item sums to the Department of Public Safety in excess of the amount of the rental payments for the fiscal year.

Appellant asserts that except for the fiscal year July 1, 1974, through June 30, 1975, when the State of Oklahoma through the State Board of Public Affairs issued to U.C. Leasing, Inc. an Award of Contract in writing for the fiscal year 1974–1975, there were no contracts entered into between U.C. Leasing, Inc. and Appellant during the period of default, and that therefore there can be no award of damages for any period other than the fiscal year July 1, 1974, through June 30, 1975. Appellants claim that the contract for a five year lease is void for those fiscal years where a new contract was not entered into by reason of the state's statutory inability to encumber unappropriated funds.

Art. 10 of the Oklahoma Constitution, § 23 provides, in part:

"Any department, institution or agency of the state operating on revenues derived from any law or laws which allocate the revenues thereof to such department, institution or agency shall not incur obligations in excess of the unencumbered balance of cash on hand."

Title 62 O.S.1971, § 41.6 provides in part that appropriations made by the Legislature for each fiscal year shall not be available for contractual or expenditure purposes until alloted as provided in the Budget Law of 1947. Section 41.9 provides in part that: "The Budget Director shall not allot to any spending agency during any fiscal year, an amount which will be in excess of the amount of revenue collected and allocated to appropriations made to such spending agency."

■ Where a person or entity enters into a valid contract with the proper State officials and a valid appropriation has been made therefor, the State has consented to be sued and has waived its governmental immunity to the extent of its contractual obligations and such contractual obligation may be enforced against the State in an ordinary action at law.[7]

Did the State incur liability for the entire rental period prescribed in the lease agreement when the lease contract was made? We hold that it did not incur anything more than a potential liability as hereafter explained.

While the lease agreement before us purports to bind an agency of the State for a term of 60 consecutive months from its inception, the lease agreement explicitly provides that if the Legislature fails to allocate funds for payment, lessee is not obligated to pay rentals beyond the term for which funds have been allocated or in excess of such funds. Thus the obligation was not absolute and in all events binding upon the State at the time of its execution, but was made contingent upon continued funding on a fiscal year basis by the Legislature continuing to appropriate funds to satisfy the obligation.

### III.

Appellant next contends that, although the Legislature appropriated sums to it and to its predecessor agency in excess of annual lease rentals, under authority of *Jacobson's Lifetime Buildings v. City of Tulsa*, Okl., 333 P.2d 307 (1958), a plaintiff in a contract action against a municipality is required to plead and prove that the judgment he seeks is within limits of avail-

---

7. *State Bd. of Pub. Affairs v. Principal Funding Corp.*, Okl., 542 P.2d 503 (1975).

able funds as is required by 62 O.S.1951 §§ 361–363, as amended, and the Oklahoma Constitution, Art. 10, § 26. However, since we have heretofore held that Appellant is not governed by Art. 10, § 26[8] of the Constitution, neither can it be bound by the provisions of 62 O.S.1951 §§ 361–363, as amended. The holding referred to in the *Jacobson's* case was limited to the application of Art. 10, § 26 of the Constitution, and of 62 O.S.1951 §§ 361–363, as amended, and cannot serve as an authority here.

The trial judge found and determined that Appellant breached the contract, that Appellee thereupon elected to declare all remaining unpaid installments due, and rendered judgment in favor of Appellee in the principal sum of $92,812.59, the unpaid balance of lease rentals provided for in the lease contract. No issue is raised on appeal concerning the measure or computation of the quantum of damages.

█ There is nothing in the evidence before us to show that there were not funds appropriated to pay lease rentals as they accrued and became due. It is presumed that the lease contract is valid and that all things requisite to its validity exist.[9] Those who challenge the validity of actions of public officials apparently within their statutory powers must carry the burden of demonstrating such invalidity.[10]

### IV.

█ Appellant next alleges error in the trial court's sustainment of Appellee's demurrer to the evidence supporting Appellant's counter-claim and in ordering said counter-claim dismissed. Appellant claims three theories as bases for its cross action against Appellee: the common law implied warranty of reasonable suitability of a chattel for its known intended use; implied warranties of merchantability and fitness for a particular purpose as specified in Art. 2 of the Uniform Commercial Code, 12A O.S.1971, § 2–301, et seq.; and implied warranties under the law of bailment. However, a careful review of the entire record reveals no competent evidence proffered by Appellant on any of the theories espoused. There were inferences of frequent breakdowns during the operation of the leased equipment, but there was no evidence that interruptions occurred due to a lack of fitness of the equipment, and the lease contract clearly places the burden of maintenance upon Appellant. Where there is no evidence introduced at the trial which supports a theory of recovery, it is the duty of the trial court to sustain a demurrer to the evidence and to dismiss the unsupported cause.[11]

### V.

█ Finally, Appellant challenges the award of interest in the judgment of the court below. No authority is cited in support of this proposition, and we know of none, which would free the State, otherwise liable on its contract, from the payment of statutory interest on damages arising from a contractual breach. Having heretofore recognized that the State may be sued on its contracts [12] we know of no reason why it should not be liable for interest allowed by statute on damages capable of being made certain by calculation to the same extent to which a private citizen would also be liable.[13]

THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.

DOOLIN, C.J., HARGRAVE, V.C.J., and LAVENDER, OPALA, ALMA WILSON and SUMMERS, JJ., concur.

SIMMS and HODGES, JJ., dissent.

KAUGER, J., disqualified.

---

**8.** See note 6, supra.

**9.** *Ambrozich v. City of Eveleth*, 200 Minn. 473, 274 N.W. 635 (1937).

**10.** *Bulman v. McCrane*, 64 N.J. 105, 312 A.2d 857 (1973).

**11.** *Colbourn v. Bell*, Okl., 294 P.2d 289 (1956).

**12.** See note 7, supra.

**13.** 23 O.S.1971 § 6. This is true certainly in the absence of a statute exempting the State from payment of interest on judgments against it.