**The INDIANA NATIONAL BANK, a national banking association, Appellant,**

**v.**

**STATE of Oklahoma DEPARTMENT OF HUMAN SERVICES; Robert Fulton, Director, State of Oklahoma Department of Human Services; Office of State Finance, State of Oklahoma; Victor Thompson, Director of State Fi-**

---

nance, State of Oklahoma; Office of Public Affairs, State of Oklahoma; Delmas Ford, Director, Office of Public Affairs, State of Oklahoma and Oklahoma Development Authority, Appellees,

and

Prudential–Bache Securities, Inc., Appellee/Additional Defendant.

No. 71787.

Supreme Court of Oklahoma.

July 20, 1993.

As Corrected July 21, 1993.

C.S. Lewis, III, Marily M. Wagner, Marc F. Conley, Robinson, Lewis, Orbison, Smith & Coyle, Tulsa, for appellant.

Charles Waters, Gen. Counsel, Roger Stuart, Asst. Gen. Counsel, John H. Harris, Asst. Gen. Counsel, Oklahoma Dept. of Human Services, Oklahoma City, for appellee DHS.

Roy J. Davis, Anne M. Moore, Jane S. Eulberg, Murrah & Davis, Oklahoma City, for appellee/additional defendant.

LAVENDER, Vice Chief Justice.

In this matter appellant, Indiana National Bank (INB) challenges a trial court grant of summary judgment to appellee, the Oklahoma Department of Human Services (DHS). We affirm the trial court.[1]

## FACTS AND PROCEDURAL HISTORY

The case concerns the acquisition of computer equipment by the Oklahoma Office of Public Affairs (OPA) for use by DHS. In December 1983, DHS requested OPA to seek bid proposals for the lease/purchase of a central processing computer unit. Although DHS requested a 60 month term, at the time, DHS, and apparently OPA, were under the impression a State agency could not enter into a lease/purchase agreement that would bind the State for a future fiscal year conditioned solely on continued fiscal year appropriations by the Legislature because they believed such a contract provision would violate certain State constitutional and statutory provisions and that the agreement had to contain a clause allowing termination at the end of each fiscal year. The request for bid proposals, thus, provided in pertinent part: "[DHS] may not be obligated for expenditures in future fiscal years. Therefore bids must provide clauses to permit cancellation at the end of each fiscal year, June 30, where appropriate."[2]

In January, 1984, OPA issued an Invitation to Bid. Public Leasing Corporation,

---

1. Also pending before us is Case No. 74,771, a separate, but related appeal by INB challenging the trial court dismissal, for failure to state a claim upon which relief could be granted, of Prudential–Bache Securities, Inc., also a defendant below.

2. After the matters pertinent to this case transpired we decided *U.C. Leasing, Inc. v. State Board of Public Affairs,* 737 P.2d 1191 (Okla.1987), an opinion which cleared up the area of the law involving acquisitions of such equipment by State entities. In *U.C. Leasing* we held that State constitutional and statutory fiscal year limitation clauses were *not* violated where a 60 month lease (a State agency as lessee) explicitly provides that if the Legislature fails to allocate or appropriate funds for payment, lessee is not obligated to pay beyond the period for which funds have been allocated. *Id.* at 1195. The converse of this would, of course, be true, i.e. the agency would be bound if adequate appropriations were made by the Legislature. This is so because the obligation is not absolute and in all events binding on the State, but is contingent upon continued funding on a fiscal year basis by the Legislature continuing to appropriate funds to satisfy the obligation. *Id.* Thus, it turns out DHS, as all now appear to concede, was wrong in its view on what could be agreed to in regard to the lease/purchase agreement. We are here, however, concerned with whether the nonsubstitution clause was invalid because it was only inserted into the agreement executed by DHS *after* the bid was accepted by OPA, not whether such a clause might have been valid had it initially been a part of the bid accepted by OPA. We note in 1989 the Legislature amended § 85.4 of the Central Purchasing Act to sanction the use of nonappropriation clauses in lease/purchase situations involving the acquisition of equipment. 74 O.S.Supp.1989, § 85.4(H).

We further note INB argues in its certiorari materials and in its June 5, 1989 Reply Brief that even without the nonsubstitution clause the agreement as awarded by OPA could not simply be unilaterally terminated by DHS at the end of a fiscal year. We refuse to consider the argument for two reasons. One, no such argument was made in the trial court. INB relied only on the nonsubstitution clause of the modified agreement. In fact, INB expressly referred to the nonsubstitution clause in its April 13, 1987, brief opposing DHS' motion for summary judgment as, "[T]he crux of the controversy at bar" and it exclusively relied on the modified agreement executed by DHS to support its claim. Parties may not present new issues on appeal which seek reversal of a trial court grant of summary judgment which were not presented to the trial court. *Northrip v. Montgomery Ward & Co.,* 529 P.2d 489, 491–494 (Okla.1974); *See also Great Plains Federal S & L v. Dabney,* 846 P.2d 1088, 1089–1090, f.n. 2 (Okla.1993);

(PLC), not a party here, responded with a bid which included a form lease/purchase agreement for an IBM computer, series 3081. Paragraph 4.1 of PLC's form agreement submitted with its bid provided in pertinent part:

It is understood and agreed between the parties hereto that the State of Oklahoma is a governmental entity subject to certain funding restrictions imposed by law, which restrictions prevent the State of Oklahoma from making an unconditional committment (sic) to a contract that obligates the State of Oklahoma beyond the current fiscal year or that obligates the State to pay charges which have not been appropriated by the Legislature of the State of Oklahoma. Accordingly, this Agreement shall be renewed for each Fiscal Year during this Agreement **if the State of Oklahoma or authorized body thereof has approved such renewal** *and* **has had sufficient funds appropriated to continue the data processing function performed by the equipment under this Agreement for such Fiscal Year.**

It is further agreed that in the event the State of Oklahoma does not renew this Agreement as provided above, such termination shall not constitute a default hereunder nor give rise to or result in any additional Customer liability or penalty whatsoever, except that [PLC] shall have the right to collect all sums due and owing under this Agreement up to the expiration of the fiscal year for which funds have been appropriated. The State of Oklahoma agrees to notify [PLC] of any nonrenewal and nonappropriation at the earliest possible time in writing. Nothing contained herein shall otherwise limit any remedies that either party may have under the laws of the State of Oklahoma.

(R. 198). (emphasis added).

OPA issued a Notice of Award of Contract to PLC, accepting the bid. The face of the Notice contained the following language: "This contract shall be in force until expiration date or until 30 days after notice has been given by the State of Oklahoma of its desire to terminate the contract". The initial contract period was specified to be 1–1–84 through 12–31–84 on the face of the Notice. Three days after the Notice was issued, Robert Fulton, Director of DHS, executed a similar lease/purchase agreement to the form agreement sent with PLC's bid, but which was modified to add the following nonsubstitution clause at the end of the first paragraph to Paragraph 4.1 quoted above:

This paragraph shall not be construed so as to permit Lessee to terminate the Lease in order to acquire any other equipment or to allocate funds directly or indirectly to perform essentially the same applications for which the equipment is intended.

(R. 10).

About three weeks later Fulton also executed an Addendum to the modified agreement. In February 1984, DHS's First Assistant General Counsel, issued an opinion referring to the Equipment Lease and Addendum No. 1 between PLC and the State (the modified lease agreement). The opinion stated in pertinent part:

2. The Lease ... has been duly authorized, executed and delivered by the Lessee and constitutes a valid, legal and binding agreement enforceable in accordance with its terms.

3. No further approval, consent or withholding of objections is required from any federal, state or local governmental authority with respect to the entering into or performance by the Lessee of the Lease and the transactions contemplated thereby and the Lessee has sufficient appropriation to pay all amounts due under the lease for the current fiscal year.

(R. 69).

In April, 1984, PLC assigned its interest in the contract to Prudential–Bache Securi-

---

*Jones v. Alpine Investments, Inc.,* 764 P.2d 513, 515 (Okla.1987) (generally parties on appeal are limited to the issues presented to the trial court). Further, no such issue is remotely covered by any issue of error set forth in the petition in error. Failure to raise an issue in the petition in error is fatal to its consideration on appeal. *Kirschstein v. Haynes,* 788 P.2d 941, 955 (Okla.1990); *Timmons v. Royal Globe Insurance Company,* 653 P.2d 907, 912 (Okla.1982).

ties, Inc. (PruBache). Soon after, Pru-Bache assigned to INB. In August, 1985, OPA sent a Notice of Award of Contract directly to INB renewing the existing contract for the time period of 7–1–85 through 6–30–86. (R. 276). The face of the Notice contained the same 30 day termination clause as on the initial Notice sent to PLC.

In May, 1986, DHS notified INB it would not renew the contract due to lack of appropriations by the Legislature. (R. 230). This reason for nonrenewal is subject to dispute. This is so because DHS replaced the IBM series 3081 with an IBM series 3090.

INB claimed breach of contract because the nonsubstitution clause forbid cancellation to replace with equipment providing essentially the same functions as the IBM 3081. It also claimed failure to pay the June 1986 lease and maintenance payments. In defense DHS argued the nonsubstitution clause was invalid because only OPA had authority to approve such a modification. It also asserted alternatively the new IBM 3090 equipment had greater capacity and additional functions so the nonsubstitution clause was not violated. It also denied it owed the June 1986 payment.

■■ On cross-motions for summary judgment (INB's being partial on the issue of liability only) the trial court denied INB's motion and granted complete summary judgment to DHS determining it was undisputed OPA had not approved the modification. He ruled as a matter of law the

nonsubstitution clause was invalid and DHS had the right to cancel the contract.[3]

INB appealed. The Court of Appeals affirmed, citing *City of Merrill v. Wenzel Bros. Inc.*, 88 Wis.2d 676, 277 N.W.2d 799 (1979) for the proposition the Invitation to Bid and the bid (and its contents) constituted the whole agreement to which the parties were bound. The terms of these documents control over any conflicting or later added provisions contained in the modified "contract" such as the nonsubstitution clause and that clause was, thus, invalid. It also determined to allow such modification would thwart the intent of the public competitive bidding laws by creating a negotiating situation only *after* a bid had been accepted by the agency in charge of accepting bids, here OPA and, therefore, DHS had no authority to bind the State to such a clause. The Court of Appeals also held because the modification containing the nonsubstitution clause was outside the scope of DHS's authority, DHS could not be estopped to deny its validity, relying on *State ex rel. Commissioners of Land Office v. Frame*, 200 Okl. 650, 199 P.2d 215, 217 (1948), which held the State cannot be estopped by the unauthorized acts of its officers. We previously granted certiorari.[4]

### SUMMARY JUDGMENT

■■ Summary judgment is a device used to reach a final judgment where there is no dispute as to any material fact. *Manora v. Watts Regulator Co.*, 784 P.2d

**3.** On appeal, INB did not preserve its objection to DHS's alleged failure to make the June 1986 payment because no such issue is raised in the petition in error. *Kirschstein v. Haynes* and *Timmons v. Royal Globe Insurance Company, supra,* note 2. INB appears to contend in its certiorari brief that it may still obtain review of the issue because the trial court acted outside its subject matter jurisdiction when it did not base its decision to grant summary judgment on the evidence presented in regard to this issue. As authority for that proposition, it refers us to *Isenhower v. Isenhower,* 666 P.2d 238 (Okla.App.1983). It is true subject matter jurisdiction cannot be waived by the parties, and it is proper to address even when it has not been raised in the trial court or preserved on appeal. *Isenhower* does not, however, support the view

the trial court acted outside his jurisdiction by granting any part of DHS' motion for summary judgment. It merely holds a court does not have jurisdiction to render judgment on a statutorily void contract. We are aware of no principle of law that simply because a trial court may have made a mistake in granting summary judgment to a party as to a certain aspect of the case, that such involves an act outside the trial court's subject matter jurisdiction. Accordingly, INB had to preserve the June 1986 payment issue in its petition in error to obtain review. It did not and we refuse to consider it further.

**4.** In our order granting certiorari we granted the petition of INB for certiorari and denied the petition of PruBache.

1056, 1058 (Okla.1989). A court may look beyond the pleadings to evidentiary material to determine whether any issue remains for jury determination. *Flanders v. Crane Co.*, 693 P.2d 602, 605 (Okla.1984). The court may consider evidence outside the pleadings such as depositions, admissions, answers to interrogatories and affidavits. 12 O.S.1991, Ch. 2, App., Rule 13. The court may not weigh evidence, but only review the evidence presented to determine whether there is a factual dispute. *Stuckey v. Young Exploration Co.*, 586 P.2d 726, 730 (Okla.1978). All inferences in the evidence must be taken in favor of the party opposing the motion. *Erwin v. Frazier*, 786 P.2d 61, 62 (Okla.1989). Summary judgment is improper if under the evidence, reasonable men could reach different conclusions from the facts. *Runyon v. Reid*, 510 P.2d 943, 946 (Okla.1973). The moving party has the burden of showing there is no substantial controversy as to any material fact. *Loper v. Austin*, 596 P.2d 544, 545 (Okla.1979). After this showing, the opposing party must demonstrate there exists a material fact in dispute which would justify a trial. *Martin v. Chapel, Wilkinson, Riggs and Abney*, 637 P.2d 81, 84 (Okla.1981). These burdens may be met by circumstantial evidence. *Manora, supra*, 784 P.2d at 1058.

For the purposes of reviewing the grant of summary judgment to DHS we must decide whether after the bid was accepted by OPA the nonsubstitution modification could be valid without approval of OPA. If not, we must decide if a factual controversy exists as to whether OPA approved the modification. Finally, we must determine whether DHS is estopped from denying the validity of the modification under the facts as presented.

### OPA WAS THE ONLY ENTITY AUTHORIZED TO NEGOTIATE AND MODIFY THE CONTRACT

 The Oklahoma Legislature adopted the Central Purchasing Act, 74 O.S.1981, § 85.1 et seq., as amended, to govern the expenditures of the various governmental agencies in acquiring goods or services.

The Act provides the State Purchasing Director, under the Supervision of the Director of Public Affairs, has the *sole and exclusive* authority and responsibility for the acquisition of all materials, supplies, equipment, and services acquired, used or consumed by state agencies, subject to certain exceptions not pertinent here. 74 O.S.Supp.1983, § 85.5. Section 85.5 also gives the Director of Public Affairs the authority and responsibility to promulgate rules and regulations governing the form, time and manner of submission of any bids submitted for contracts to furnish items or services [§ 85.5(3)], and the conditions under which written contracts for such purchases are to be required and the conditions and manner of negotiating such contracts. § 85.5(4). The Act requires competitive bidding for most major purchases and is designed to protect the public at large by promoting economy in government and reducing the likelihood of fraud. *State of Oklahoma ex rel. Cartwright v. Tidmore*, 674 P.2d 14, 16 (Okla.1983). It also insures that government officials are accountable to the public, and are discharging their duties competently and responsibly. *Id.* The instant acquisition of computer equipment was subject to the Act and its provisions concerning competitive bidding.

 In conformity with the rulemaking responsibility, rules were passed which are contained in an official publication entitled "How to Sell to the State of Oklahoma", pertinent portions of which were attached to DHS' materials in support of summary judgment. As agency rules they have the force and effect of law. *Toxic Waste Impact Group v. Leavitt*, 755 P.2d 626, 630 (Okla.1988). The rules provide in pertinent part as follows:

### C. Bid Contents—Terms and conditions

1. **Entire Agreement.** The terms and conditions of this section together with the Invitation to Bid and any other sheets or documents made a part of the Invitation to Bid, shall constitute the entire agreement between the parties.

**2. Modifications.** An addendum will be issued for any changes in, additions to, or waivers of specification, terms, or conditions of a bid. This addendum must be issued by the Central Purchasing Division.

**3. Offer Firm For Thirty Days.** Return of an Invitation to Bid constitutes a valid offer guaranteed for a minimum of thirty (30) days by the vendor.

(bolding in original)

The language on the back of the Invitation to Bid further stated:

13. All bids submitted are subject to "Central Purchasing Rules and Regulations," and these General or any Special Conditions and specification listed herein—all of which are made a part of this bid invitation by reference.

14. This bid is submitted as a legal offer and any bid when accepted by the Office of Public Affairs constitutes a firm contract.

(R. 193).

 The rules and the language on the Invitation to Bid, coupled with the sole and exclusive authority given to the Purchasing Director of OPA in § 85.5, to acquire all materials, supplies, equipment and services used by State agencies, make it abundantly clear that when OPA awards a contract it is OPA that had to agree to any changes after the bid was submitted. The regulations describe the terms of the entire agreement as the bid contents, the Invitation to Bid and any other sheets or documents made a part of the Invitation to Bid. Thus, when OPA awarded the contract based on these documents the entire agreement between the parties was formed.[5] INB points to no statute or rule that would be relevant to the instant situation which expresses an intent to allow agencies the ability to modify contractual terms submitted with a bid after OPA has awarded a contract, and, like the Court of Appeals, we believe to allow any material modifications by agencies after a contract is awarded by OPA, without approval of OPA, would completely undermine the intent and purpose behind the Act.[6]

The language of the Act and the rules clearly indicate it is OPA that is to be the

---

**5.** INB attempts to make much of the fact the form agreement which was a part of the bid proposal from PLC sent to OPA contains numerous blank spaces. This is correct. However, what INB fails to realize is that most, if not all, of the information that one would normally have expected to go in these blank spaces *was* contained in other documents that OPA's pertinent rules considered part of the entire agreement between the parties. Two examples INB points to are that the form lease does not identify the proposed lessee, nor describe the equipment to be leased. The lessee was clearly shown to be DHS on the Request for Bid Proposal DHS sent to OPA, which was sent out with the Invitation to Bid. It was the entity seeking the assistance of OPA in acquiring the equipment. DHS was also identified on the face of the Invitation to Bid as the State agency the equipment was to be shipped to *and* the State agency to be charged and invoiced. As to not describing the equipment INB's argument is flawed because the equipment is described in more than one place on documents which became part of the contract. It is described on the face of the Invitation to Bid sent out by OPA and on the face of the Invitation to Bid executed by PLC and returned to OPA, which constituted, with supporting documents, PLC's bid proposal, which was then accepted by OPA. It is also more fully described on a related document attached to PLC's bid. It is also worth pointing out the Notice of Award of Contract from OPA

to PLC also contained the monthly lease/purchase and the maintenance prices, as did PLC's executed return of the Invitation to Bid. Thus, INB's argument does not hold water. Even assuming some blank space in the form agreement did not correspond to information in another document that did become part of the agreement pursuant to OPA rule this fact would merely be a red herring to what we are considering here, to wit: was the nonsubstitution clause part of the agreement without being approved by OPA? We need not and, therefore, do not decide whether it would be better practice for OPA to require a form agreement sent in as part of a bid to be formerly executed and have all the blank spaces thereto filled in. For the purposes of our case we merely note the entire agreement as described in OPA's rules *was executed* on behalf of PLC by the signature of that firm which appeared on the return of the Invitation to Bid, i.e. PLC's bid proposal.

**6.** Although there may be a situation or situations where another State agency other than OPA is entitled to itself award the contract if approval is given by OPA of any conditions the agency is to follow, and other pertinent restrictions of the competitive bid laws are followed, INB has not relied on any such scenario in this case and, here, as is clear from the record, it was OPA that issued the Notice of Award of Contract. An example of such a potential situation is discussed in Attorney General Op. No.

sole entity with the authority to negotiate and accept contract offers, with certain exceptions not relevant here.[7] To allow agencies to subsequently negotiate and modify material clauses after other parties have been excluded through the competitive bidding process undermines the integrity of the system and makes such a system meaningless. We do not believe in the instant situation the Legislature intended or contemplated such a result, nor do we believe the rules of OPA allow for such a subsequent material modification.[8] Because the rules governing the modification of contracts have the force and effect of law, DHS was powerless to waive their requirements. *Ashland Oil, Inc. v. Corporation Com'n.*, 595 P.2d 423, 426 (Okla.1979).

INB cites *U.C. Leasing v. State Board. of Public Affairs*, 737 P.2d 1191 (Okla.1987), to support an argument negotiations and subsequent modifications between agencies and private contractors is permitted under the Act after OPA has awarded a contract. In *U.C. Leasing*, we stated:

> 78–228 where in the past the Central Purchasing Division has entered into price agreements or contracts for commodities of common usage by agencies of the State. Notification is then given to all agencies in the form of a purchasing division contract price schedule. The agencies may then purchase directly from the vendor, apparently awarding their own contract. As noted, however, such a situation would involve the prior approval of OPA and a prior agreement with a vendor for commodities in common usage by State agencies. 74 O.S.Supp.1983, § 85.4 would also appear to allow an agency to purchase equipment for itself, but before doing so written authorization would have been required from the Purchasing Director. These situations are, however, not involved here.

**7.** This is not to say OPA is not to consult in good faith with a requesting agency during the process. 74 O.S.Supp.1983, § 85.5, specifically requires OPA to consult with a requesting or purchasing agency.

**8.** We further note the modified agreement with the nonsubstitution clause appears to violate Rule C(3) which provides the bid proposal shall be considered a valid offer guaranteed for a minimum of 30 days. PLC's bid proposal is stamped received by OPA on January 13, 1984. The modified agreement was executed by Fulton on January 30, 1984, i.e. within the 30 day

... [Appellee's predecessor] submitted a proposal for bid which resulted in a written lease agreement and the State Board of Public Affairs issuing an award of contract for the lease of one message switching device. Thereafter, Appellant negotiated with [predecessor] for additional features and equipment to be added to modify the original system, all of which became a part of the lease agreement.

Id. at 1193–1194.

■ INB asserts *U.C. Leasing*, thus, somehow sanctioned the authority of agencies other than OPA to negotiate modifications to agreements after OPA has accepted a bid, without obtaining ultimate approval by OPA. We disagree. The facts of *U.C. Leasing* as revealed by the opinion do not indicate such modifications were unauthorized by OPA or lacked OPA approval. Accordingly, *U.C. Leasing* does not hold other State agencies are authorized to modify contracts entered into between OPA and private vendors. We now squarely hold it is only OPA that has authority to

period, which was also three days after the bid had been accepted by OPA. It also appears to violate Rule C(2) as it seems to be nothing more than an attempt to modify the bid after the bid had already been accepted by OPA. INB argues these just cited rules really have nothing to do with our situation because they are only concerned with modifying a bid prior to acceptance by OPA. This argument is obviously flawed. Although INB appears technically correct these rules are concerned with modifying a bid prior to acceptance, we believe it would defy logic to allow the bid to be modified after acceptance, but not before, *without approval of OPA.* Possibly an agency can modify an agreement in certain nonmaterial ways without involving OPA, but when a material modification (here the nonsubstitution clause) is at issue it would hold the potential for completely disrupting the competitive bidding process to allow each of the numerous State agencies free hand to negotiate and agree to such modifications. INB's apparent argument that the Central Purchasing Act and the competitive bidding laws are only to insure the equipment is needed and the best price is paid therefore is also flawed. Such terms, although extremely important, are certainly not the only material terms of contracts contemplated by the Act. How, when or why a contract may be terminated without breach, as many other issues, are also important, as evidenced by this case, where the monetary amount at issue involves in the area of $2 million dollars.

approve material modifications of agreements once it has accepted a bid in response to an invitation to bid, in the absence of some other Legislative authority to the contrary or specific approval from OPA sanctioning another agencies' authority to agree to such a modification. To rule otherwise would completely obliterate the Central Purchasing Act.

## THE NONSUBSTITUTION CLAUSE WAS NOT PART OF THE ORIGINAL AGREEMENT BETWEEN THE STATE AND PLC

 DHS produced evidence through the affidavit of the Purchasing Director of the State of Oklahoma that the modified agreement containing the nonsubstitution clause was never submitted to or approved by OPA. INB offered no evidence we can discern to the effect the modified agreement was submitted to or approved by OPA prior to OPA's acceptance of PLC's bid proposal. Its only argument as to OPA approval is that OPA somehow approved the modified agreement when it directly sent INB the Notice of Award of Contract for the fiscal year 7-1-85 through 6-30-86, which we discuss momentarily. Thus, as to the nonsubstitution clause not being approved by OPA prior to its awarding of the initial contract to PLC, the affidavit of the Purchasing Director stands unrefuted. A material fact set forth in the statement of a movant for summary judgment supported by admissible evidence is deemed admitted unless specifically controverted by a statement of the adverse party supported by admissible evidence. 12 O.S.1991, Ch. 2, App., Rule 13(b). *See Liberty National Bank and Trust Company v. Ginn*, 832 P.2d 33, 35 (Okla.App.1992). Therefore, we must take as true the fact the agreement was modified without the knowledge or approval of OPA. Because the nonsubstitution clause was not a part of the bid originally submitted by PLC to OPA and no evidence exists in this record the clause was approved prior to acceptance of PLC's bid proposal it cannot be considered to have been part of the original agreement.

## THE RENEWAL OF THE LEASE/PURCHASE AGREEMENT

 We start with the unrefuted evidence of the affidavit of the Purchasing Director that the modified agreement was never submitted to or approved by OPA. In opposition to this affidavit INB argues OPA must have known the contract it awarded to PLC was modified because OPA sent the renewal for 7-1-85 through 6-30-86 directly to INB and it points to the Assignments from PLC to PruBache, and from PruBache to INB which refer to the contract date as January 30, 1984 (the date the modified agreement was executed), rather than January 27, 1984 (the date OPA awarded the contract to PLC) and the Addendum dated February 22, 1984 signed by Fulton. INB argues because the only "contract" it was assigned was the one containing the nonsubstitution clause this could have been the only contract OPA renewed in 1985 and that this evidence is sufficient to create a factual question as to whether OPA approved the modified agreement with the nonsubstitution clause. We disagree.

 For a contract to be modified the mutual assent of both parties is required. *State ex rel. Oklahoma Capitol Improvement Authority v. Walter Nashert & Sons, Inc.*, 518 P.2d 1267, 1270 (Okla.1974). There is no evidence in the reviewable record OPA assented to or agreed to the nonsubstitution clause, but only that it somehow knew INB was to receive the lease payments under the original contract awarded by OPA. No evidence in opposition to DHS' motion for summary judgment was presented by INB that tends to show OPA ever saw the modified agreement or the assignment documents which may have alerted OPA the contract it had awarded had been modified. At most INB relies on pure speculation. We must decide this case on the reviewable evidence properly put before the trial court by the parties and not on what evidence may exist which might show OPA approved the modified agreement. *Frey v. Independence*

*Fire and Casualty Co.,* 698 P.2d 17, 20 (Okla.1985) (a ruling on a motion for summary judgment must be rested on the record then before the trial court rather than one that could have been assembled). INB simply presented no evidence that OPA approved the modified agreement or even knew it existed. In this situation there is no material factual dispute as to whether OPA approved the modification. The reviewable record, in the form of the unrefuted affidavit of the Purchasing Director of OPA, shows it did not.

## DHS CANNOT BE ESTOPPED FROM DENYING THE NONSUBSTITUTION CLAUSE

██ The general rule is the application of estoppel is not allowed against the state, political subdivisions or agencies, unless it would further a principle of public policy or interest. *Burdick v. Independent School Dist.,* 702 P.2d 48, 53 (Okla.1985). INB asserts there is a compelling interest in requiring the State to follow through on its obligations else its reputation and credibility with merchants be irreparably damaged. DHS argues the goals of the Central Purchasing Act will be thwarted if agencies are allowed to negotiate with private vendors. In our view the elements of estoppel are not met here nor is there any compelling interest which would further a principle of public policy which might call for its application against DHS.

██ The elements necessary to establish an equitable estoppel are (1) a false representation or concealment of facts, (2) made with actual or constructive knowledge of the fact, (3) to a person without knowledge of, or the means of knowing, those facts, (4) with the intent it be acted upon, and (5) the person to whom it was made acted in reliance upon it to its detriment. *Burdick,* 702 P.2d at 55. The essential element of estoppel is not intent, but rather, action on the part of another in justifiable reliance upon the conduct of the

party allegedly estopped. *Bay Petroleum Corp. v. May,* 264 P.2d 734, 736 (Okla.1953).

██ The false representation in this case is apparently the assertion DHS had authority to negotiate and agree to modifications in the contract entered into between OPA and a private vendor without OPA approval. DHS did not have such authority. However, any assertions by DHS of such authority were not made to an entity who was without knowledge *or the means of knowing* these facts. Both the statutes and the rules granting OPA the exclusive authority to negotiate contracts were published and available to private vendors. The legal opinion of staff counsel of DHS stating the modified contract need not be authorized by OPA cannot be used to set aside law governing a contract between a private vendor and OPA. Finally, as far as any reliance on OPA's possible later approval of the modified contract is concerned, INB could not have acted in reliance upon such an act because it had already purchased the assignment over a year earlier.[9]

Further, we held in *Ashland, supra,* 595 P.2d at 426, the doctrine of estoppel has no application to agencies when their acts are beyond the authority granted to them, or *ultra vires.* This holding is justified because persons dealing with public officials are charged with notice of limitations upon their powers. *Id.; See also State v. Frame, supra,* 199 P.2d at 217 (those who deal with officers of the State are bound to know the extent of their authority). Thus, DHS cannot be held estopped from denying the validity of the nonsubstitution clause even if its agents mistakenly or falsely asserted it had authority to approve such modifications because it had no such authority.

The Court of Appeals held DHS' First Assistant General Counsel acted outside the scope of his authority by stating the

---

**9.** Furthermore, to the extent INB *appears* to argue in one or more of its appellate submissions we should apply estoppel against *OPA* because of some act or omission on that agen-

cy's part, such argument is yet another issue neither raised in the trial court or in the petition in error. Thus, we refuse to consider it.

modified contract was valid, because such an interpretation directly contradicted the Oklahoma competitive bidding requirements. INB claims the nonsubstitution clause does not directly contradict the Oklahoma bidding statutes and DHS attorney, T.H.T. was acting within the scope of his authority when he issued the legal opinion stating the modifications to the original contract did not require authorization from OPA. Accordingly, it argues the rule in *Ashland* does not apply in this case.

It is true that part of the duties of DHS counsel include evaluating the legality of action taken by the agency. However, the legal advice of DHS counsel is directed to *agency personnel, not private outside parties.* To advise private vendors of the legality of OPA contracts does not fall within the staff attorney's duties, and such advice is outside his scope of authority. Further, as stated previously, private parties cannot, as a matter of law, be said to be justified in relying on a legal opinion of DHS personnel because they were charged with notice of the limitations of DHS' power to modify contracts.

We finally note we can discern no compelling public policy that would warrant applying estoppel against DHS in this case. The overriding public policy interest is that found in the Central Purchasing Act which generally requires private vendors selling goods and services to State agencies to deal with a central entity (OPA) to promote efficient and cost effective use of taxpayer money and to prevent fraud in these dealings. If we allowed estoppel here it would send a signal State agencies and private vendors could potentially ignore the provisions of the Central Purchasing Act to enter into various sweetheart contractual provisions which the courts would enforce based on the doctrine of estoppel. We decline to make such a ruling. For these reasons we hold DHS is not estopped to deny the validity of the nonsubstitution clause.

The decision of the Court of Appeals is **VACATED** and the judgment of the trial court is **AFFIRMED.**

HODGES, C.J., and HARGRAVE, ALMA WILSON, KAUGER and WATT, JJ., concur.

SIMMS, J., concurs in judgment.

SUMMERS, J., concurs in part; dissents in part.