1999 OK 64

**Jerry R. FENT and Margaret B. Fent, husband and wife, as resident taxpayers and voters of the State of Oklahoma, Petitioners,**

v.

**OKLAHOMA CAPITOL IMPROVEMENT AUTHORITY, a body corporate and politic of the Oklahoma of Oklahoma.**

No. 92,390.

Supreme Court of Oklahoma.

June 28, 1999.

As Corrected June 28 and July 8, 1999.

Rehearing Denied July 13, 1999.

Russell B. Fister, Oklahoma City, Oklahoma for Petitioner.

Douglas F. Price, Assistant Attorney General, Oklahoma City, Oklahoma; Thomas J. Hilborne, Jr. of Hilborne & Weidman, Tulsa, Oklahoma; and Gary M. Bush of Fagin, Brown, Bush, Tinney & Kiser, Oklahoma City, Oklahoma for Respondent.

PER CURIAM:

¶1 Under 73 O.S.1991, § 160, this Court is given exclusive original jurisdiction to determine the validity of bond issues proposed by respondent, Oklahoma Capitol Improvement Authority (OCIA). Petitioners, Jerry R. Fent and Margaret B. Fent (husband and wife), two resident taxpayers and registered voters of Oklahoma (hereafter taxpayers) brought this original proceeding challenging the constitutionality of two statutes, 73 O.S. Supp.1998, §§ 168.3 and 301, which together authorize OCIA to issue over $300 million dollars in bonds to fund various governmental projects.[1] Taxpayers seek disapproval of any bonds issued under the statutes, primarily based on the argument the bonds would create prohibited debt in violation of OKLA. CONST. art. 10, §§ 23,[2] 24[3] and 25[4] (balanced budget provisions) without a vote of the State's citizens. They also claim the statutes were passed in violation of one or more of the strictures of OKLA. CONST. art. 5, § 33. Section 33 requires revenue bills to originate in the State House of Representatives, that no such bill be passed in the last five days of a legislative session and that such bills must garner a 75% super-majority vote in both the State House and Senate to avoid being submitted to a vote of the people. OCIA asserts neither statute authorizes prohibited debt, that neither is a revenue bill controlled by § 33, and OCIA seeks approval of two proposed bond issues, one in the amount of $10 million dollars and the other in the amount of $155 million dollars.

1. We note that an individual, Edwin Kessler has filed an entry of appearance in this matter on behalf of himself and an organization named Common Cause Oklahoma of which Mr. Kessler is State Chair. Mr. Kessler also filed a brief in this matter on May 26, 1999, wherein, like Jerry R. Fent and Margaret B. Fent, the two taxpayer petitioners that initiated this proceeding, he sets forth his arguments in opposition to the bond issues involved here, apparently on behalf of himself and the organization. In essence, the arguments of Mr. Kessler are substantially the same as those made by the two taxpayer petitioners. Further, at a hearing held in this matter on May 28, 1999 before a Referee of this Court, an individual by the name of Marjorie Greer, purportedly representing the Norman League of Women Voters, as its co-chair, appeared to protest the proposed bond issues. Ms. Greer has not filed any substantive briefs in this matter. At the May 28th hearing she orally stated her support for the brief filed by Mr. Kessler.

2. OKLA. CONST. art. 10, § 23 provides in relevant part:

The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.

3. OKLA. CONST. art. 10, § 24 provides in relevant part:

In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war....

4. OKLA. CONST. art. 10, § 25 provides in relevant part:

Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election.....

¶ 2 We hold taxpayers have failed to show either § 168.3 or § 301 are unconstitutional. Neither authorizes debt in the constitutional sense because they only allow for the issuance of what are known as appropriation-risk or moral obligation bonds. Oklahoma constitutional balanced budget provisions are, thus, inapplicable. Further, §§ 168.3 and 301 are not revenue bills controlled by OKLA. CONST. art. 5, § 33 because their principal object is not the raising of revenue, but to provide adequate facilities and/or equipment for State agencies, departments and/or instrumentalities and no taxes are levied or authorized to be levied by either statute. Finally, the two proposed bond issues in the total amount of $165 million dollars sought to be approved by OCIA are valid as authorized by either § 168.3 or § 301.

## PART I.  STANDARD OF REVIEW.

■■■ ¶ 3 In considering a statute's constitutionality, courts are guided by well established principles. *Application of Oklahoma Capitol Improvement Authority*, 1960 OK 207, 355 P.2d 1028, 1031. A heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality and every presumption is to be indulged in favor of the constitutionality of a statute. *Application of Oklahoma Capitol Improvement Authority*, 1998 OK 25, 958 P.2d 759, 763, cert. denied —— U.S. ——, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998). If two possible interpretations of a statute are possible, only one of which would render it unconstitutional, a court is bound to give the statute an interpretation that will render it constitutional, unless constitutional infirmity is shown beyond a reasonable doubt. *Gilbert Central Corp. v. State*, 1986 OK 6, 716 P.2d 654, 658. A court is bound to accept an interpretation that avoids constitutional doubt as to the legality of a legislative enactment. *Id.*

■■■ ¶ 4 t is also firmly recognized that it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition. *Application of Oklahoma Capitol Improvement Authority, supra*, 355 P.2d at 1031; *Oklahoma Industries Authority v. Barnes*, 1988 OK 98, 769 P.2d

115, 119 (the judiciary cannot challenge the wisdom, need or desirability of any constitutionally valid legislation). Such questions are plainly and definitely established by our fundamental law as functions of the legislative branch of government. *Application of Oklahoma Capitol Improvement Authority, supra*, 355 P.2d at 1031. Respect for the integrity of our tripartite scheme for distribution of governmental powers commands that the judiciary abstain from intrusion into legislative policymaking. *Oklahoma Industries Authority v. Barnes, supra*, 769 P.2d at 119. A court's function, when the constitutionality of a statute is put at issue, is limited to a determination of the validity or invalidity of the legislative provision [*Application of Oklahoma Capitol Improvement Authority, supra*, 355 P.2d at 1031] and a court's function extends no farther in our system of government.

■■■ ¶ 5 Furthermore, this Court recognized only last year that unless there is a specific constitutional prohibition, the Legislature has the right and responsibility to declare Oklahoma's fiscal policy. *Application of Oklahoma Capitol Improvement Authority, supra*, 958 P.2d at 763. Simply, in ruling on the constitutional validity of a statute relating to this State's fiscal affairs, we are not allowed to consider whether it is based on sound economic theory or whether it is the best means to achieve the desired result because such matters are for legislative determination. *Id.* With these principles understood, we turn to review the statutes involved here and the two proposed bond issues.

## PART II.  THE BONDS AUTHORIZED BY §§ 168.3 AND 301 ARE NOT DEBT IN A CONSTITUTIONAL SENSE BECAUSE THEY DO NOT CREATE A LEGAL OBLIGATION TO PAY STATE MONIES BEYOND A CURRENT ANNUAL LEGISLATIVE APPROPRIATION. BECAUSE THE BOND PROPOSALS BEFORE U.S. DO NOT CREATE PROHIBITED CONSTITUTIONAL DEBT, THE BUDGET BALANCING AMENDMENTS OF OKLA. CONST.  ART. 10, §§ 23, 24 AND 25 ARE INAPPLICABLE.

■■■ ¶ 6 Although we have considered all arguments raised by taxpayers in an attempt

to show the two statutes involved here and the bonds authorized to be issued thereunder, violate OKLA. CONST. art. 10, §§ 23, 24 and 25, we are convinced neither statute authorizes State debt as contemplated by those constitutional provisions and, therefore, those constitutional balanced budget provisions are simply inapplicable to the bonds sought to be issued and sold by the OCIA under the grant of authority contained in §§ 168.3 and 301. At most, the statutes authorize only appropriation-risk or moral obligation bonds, and under our previous cases the issuance and sale of such bonds do not create debt in a constitutional sense.

¶ 7 Section 168.3 authorizes OCIA to issue and sell bonds to fund certain building projects at the Oklahoma School of Science and Mathematics.[5] Section 301 authorizes

5. 73 O.S. Supp.1998, § 168.3 provides in full:

A. The Oklahoma Capitol Improvement Authority may acquire land owned by the Board of Trustees of the Oklahoma School of Science and Mathematics. The Oklahoma Capitol Improvement Authority may provide for the funding, construction and maintenance of a building or buildings for use by the Board of Trustees of the Oklahoma School of Science and Mathematics for the operation of the Oklahoma School of Science and Mathematics, and shall hold title to the facilities until such time as the indebtedness created pursuant to this section shall be retired or defeased. Upon the retirement of the indebtedness created pursuant to this section, the title to the land and improvements thereon shall be transferred from the Oklahoma Capitol Improvement Authority to the Board of Trustees of the Oklahoma School of Science and Mathematics.

B. For the purpose of paying the costs of the project authorized in subsection A of this section, the Authority is authorized to borrow monies on the credit of the income and revenues to be derived from such project and, in anticipation of the collection of such income and revenues, to issue negotiable or competitive bonds not to exceed the sum of Six Million Dollars ($6,000,-000.00) as may be necessary for such purpose as determined by the Authority. The Oklahoma School of Science and Mathematics may not be moved from the building or buildings constructed pursuant to subsection A of this section until all such indebtedness is retired, and shall be required to lease the building or buildings so constructed subject to receiving an annual appropriation for that purpose. It is the intent of the Legislature to appropriate to the Oklahoma School of Science and Mathematics sufficient monies to make lease payments to the Authority for purposes of retiring the debt created pursuant to this section.

C. The bonds provided for in subsection B of this section shall not be issued until such time as the Board of Trustees of the Oklahoma School of Science and Mathematics has met the matching requirement as provided for in subsection G of this section or until a bank that is chartered in this state notifies the Authority, the Governor, the Speaker of the House of Representatives and the President Pro Tempore of the Senate that there exists an irrevocable restricted letter of credit for outstanding pledges or cash on deposit or a combination of both in the amount of Six Million Dollars ($6,000,000.00) for the purpose specified in subsection A of this section. Such notification must occur no later than July 1, 1998. In the alternative, the Authority may issue such bonds in series of no less than One Million Dollars ($1,000,000.00) each. In order to issue the first series of bonds, a bank, as described above, shall certify to the Authority and the above-referenced officers that there exist irrevocable letters of credit for outstanding pledges or cash on deposit or a combination of both in an amount equal to the amount of the first series. In order to issue any subsequent series of bonds, a bank, as described above, shall certify to the Authority and the above-referenced officers that there exist irrevocable letters of credit for outstanding pledges or cash on deposit or a combination of both in amounts equal to the amount of each subsequent series. Any irrevocable letter of credit required by this subsection shall be issued by a bank chartered in this state and insured by the Federal Deposit Insurance Corporation to the maximum limit available.

D. The proceeds of any bonds issued pursuant to this section and any other monies expended by the Board of Trustees for construction or improvements shall be expended for facilities, which shall include design fees for each such project. The first phase of any campus construction or improvements shall be limited to student housing, a dining facility, library, physical education and student activity facilities, and security needs including but not limited to fencing.

E. All interest earned on any reserve funds created by such bonds held by the State Treasurer, as collected, shall be paid into the General Revenue Fund.

F. Insofar as they are not in conflict with the provisions of this section, the provisions of Section 151 et seq. of Title 73 of the Oklahoma Statutes shall apply to this section.

G. Except as otherwise provided in this subsection, any private, public or nonstate monies pledged or deposited in accordance with this section for the purpose of construction of the campus of the Oklahoma School of Science and Mathematics shall be matched not to exceed Six Million Dollars ($6,000,000.00) by the state as follows:

| State | Nonstate | Year of Contribution |
|---|---|---|
| 60% | 40% | July 1, 1993–June 30, 1995 |
| 50% | 50% | July 1, 1995–June 30, 1998 |
| 40% | 60% | July 1, 1998–June 30, 1999 |

No federal funds shall be used for matching purposes pursuant to this subsection.

OCIA to issue and sell bonds to fund various governmental projects, ranging from construction of a new building for the J.D. McCarty Center for Children with Developmental Disabilities to the purchase of computer hardware and software for the Oklahoma Department of Central Services.[6]

We note that the 47th Oklahoma Legislature amended § 168.3 by Senate Bill 172, § 2 (signed by the Governor on June 8, 1999), but not in a way material to our disposition of this matter. Essentially, the amendments increased to eight million five hundred thousand dollars the amount of six million dollars specified in § 168.3(B), (C) and (G), and changed the 40%–60% State/Nonstate matching fund provision for July 1, 1998 to June 30, 1999 found in § 168.3(G) to 50%–50% State/Nonstate for July 1, 1998 to June 30, 2000.

6. 73 O.S. Supp.1998, § 301 provides in full:

A. The Oklahoma Capitol Improvement Authority is authorized to acquire real property, together with improvements located thereon, and personal property, to construct buildings and other improvements to real property and to provide funding for repairs, refurbishments and improvements to real and personal property and for funding for the following capital projects in the following amounts:

1. Capital projects at institutions of higher education which are part of The Oklahoma State System of Higher Education in a total amount not to exceed Forty-five Million Dollars ($45,000,000.00) with debt retirement payments to be made by the Oklahoma State Regents for Higher Education;

2. Construction of a History Center for the Oklahoma Historical Society in a total amount not to exceed Thirty-two Million Dollars ($32,000,000.00) with debt retirement payments to be made by the Oklahoma Historical Society;

3. Renovation of the Wiley Post Historical Building for occupancy by appellate courts in a total amount not to exceed Ten Million Dollars ($10,000,000.00) with debt retirement payments to be made by the Oklahoma Supreme Court;

4. Land acquisition, demolition, landscaping, environmental remediation and other costs associated with the Lincoln Boulevard Renaissance Project in a total amount not to exceed Thirteen Million Eight Hundred Thousand Dollars ($13,800,000.00) with debt retirement payments to be made by the Department of Central Services;

5. Construction of a new building for the J.D. McCarty Center for Children with Developmental Disabilities in a total amount not to exceed Ten Million Three Hundred Thousand Dollars ($10,300,000.00) with debt retirement payments to be made by the J.D. McCarty Center for Children with Developmental Disabilities;

6. Funding for capital costs of a Technology Incubator Program for the University Hospitals Authority in a total amount not to exceed Two Million Dollars ($2,000,000.00) with debt retirement payments to be made by the University Hospitals Authority;

7. Funding for capital costs for the Native American Cultural and Educational Authority of Oklahoma in a total amount not to exceed Five Million Dollars($5,000,000.00) with debt retirement payments to be made by the Native American Cultural and Educational Authority of Oklahoma;

8. Funding for capital costs for systemwide equipment for the Oklahoma Department of Vocational and Technical Education in a total amount not to exceed Five Million Dollars ($5,000,000.00) with debt retirement payments to be made by the Oklahoma Department of Vocational and Technical Education;

9. Capital projects for the Oklahoma School for the Deaf in a total amount not to exceed Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00) with debt retirement payments to be made by the State Department of Rehabilitation Services;

10. Capital projects for the Oklahoma School for the Blind in a total amount not to exceed Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00) with debt retirement payments to be made by the State Department of Rehabilitation Services;

11. Construction of a new Veterans Center in Lawton, Oklahoma, in a total amount not to exceed Twelve Million Dollars ($12,000,000.00) with debt retirement payments to be made by the Oklahoma Department of Veterans Affairs;

12. Capital costs for financial management information systems in a total amount not to exceed One Million Dollars ($1,000,000.00) with debt retirement payments to be made by the Office of State Finance;

13. Funding for the purchase of computer hardware and software for the Central Purchasing Division of the Department of Central Services in a total amount not to exceed Two Million Dollars ($2,000,000.00) with debt retirement payments to be made by the Department of Central Services;

14. Funding for implementation of the Boll Weevil Eradication Act in a total amount not to exceed Three Million Dollars ($3,000,000.00) with debt retirement payments to be made by the State Department of Agriculture;

15. Funding for construction and other capital costs at Quartz Mountain Lodge and Arts and Conference Center in a total amount not to exceed Three Million Five Hundred Thousand Dollars ($3,500,000.00) with debt retirement payments to be made by the Oklahoma Tourism and Recreation Department; and

16. Such other capital projects as may be specifically authorized by the Oklahoma Legislature to be funded by the obligations authorized herein.

The Authority may hold title to the real and personal property and improvements until such time as any obligations issued for this purpose are retired or defeated and may lease the real property and improvements to the agencies indi-

¶ 8   As we interpret both statutes, OCIA is authorized thereunder to fund the costs of the various projects by borrowing monies on the credit of the income and revenues to be derived from the projects. The money borrowed will, of course, come from the issuance and sale of the bonds. In turn, the bonds are to be retired by payments made to OCIA by the various agencies, departments and/or instrumentalities using and/or benefitting from the projects under lease or other agreements with OCIA. Although each statute expresses an intent to appropriate sufficient monies to the various agencies, etc. to make such payments to OCIA for the purpose of retiring the bonds, nowhere in either statute is there a provision obligating a future legislature to do so. In such regard, we find applicable the following statement made only last year by this Court in a case concerning the approval of bonds proposed to be issued by OCIA to fund construction, repair and maintenance of state highways:

cated herein. Upon final redemption or defeasance of the obligations created pursuant to this section, title to the real and personal property and improvements shall be transferred from the Oklahoma Capitol Improvement Authority, to the agencies indicated herein.

B.   For the purpose of paying the costs for acquisition and construction of the real property and improvements and personal property and making the repairs, refurbishments, and improvements to real and personal property, and providing funding for the projects authorized in subsection A of this section, and for the purpose authorized in subsection C of this section, the Authority is hereby authorized to borrow monies on the credit of the income and revenues to be derived from the leasing of such real and personal property and improvements and, in anticipation of the collection of such income and revenues, to issue negotiable obligations in a total amount not to exceed Three Hundred Twenty Million Dollars ($320,000,000.00) whether issued in one or more series. The Department of Central Services is authorized and directed to expend funds from the Capital Improvement Revolving Fund in amounts sufficient to make required payments pursuant to such obligations during the fiscal year ending June 30, 1999. For subsequent fiscal years, it is the intent of the Legislature to appropriate to the indicated state agencies sufficient monies to make rental payments for the purposes of retiring the obligations created pursuant to this section. The costs for acquisition and construction of the real and personal property and improvements and repairs, refurbishments and funding for the projects authorized in subsection A of this section shall not exceed Three Hundred Fifteen Million Dollars ($315,000,000.00).

C.   To the extent funds are available from the proceeds of the borrowing authorized by subsection B of this section, the Oklahoma Capitol Improvement Authority shall provide for the payment of professional fees and associated costs related to the projects authorized in subsection A of this section.

D.   The Authority may issue obligations in one or more series and in conjunction with other issues of the Authority. The Authority is authorized to hire bond counsel, financial consultants, and such other professionals as it may deem necessary to provide for the efficient sale of the obligations and may utilize a portion of the proceeds of any borrowing to create such reserves as may be deemed necessary and to pay costs associated with the issuance and administration of such obligations.

E.   The obligations authorized under this section may be sold at either competitive or negotiated sale, as determined by the Authority, and in such form and at such prices as may be authorized by the Authority. The Authority may enter into agreements with such credit enhancers and liquidity providers as may be determined necessary to efficiently market the obligations. The obligations may mature and have such provisions for redemption as shall be determined by the Authority, but in no event shall the final maturity of such obligations occur later than thirty (30) years from the first principal maturity date.

F.   Any interest earnings on funds or accounts created for the purposes of this section may be utilized as partial payment of the annual debt service or for the purposes directed by the Authority.

G.   The obligations issued under this section, the transfer thereof and the interest earned on such obligations, including any profit derived from the sale thereof, shall not be subject to taxation of any kind by the State of Oklahoma, or by any county, municipality or political subdivision therein.

H.   The Authority may direct the investment of all monies in any funds or accounts created in connection with the offering of the obligations authorized under this section. Such investments shall be made in a manner consistent with the investment guidelines of the State Treasurer. The Authority may place additional restrictions on the investment of such monies if necessary to enhance the marketability of the obligations.

I.   It is the intent of the Legislature to authorize specific capital projects in the 1st Session of the 47th Oklahoma Legislature to be funded by the negotiable obligations authorized in this section. Such capital projects shall not exceed One Hundred Fifty-six Million Nine Hundred Thousand Dollars ($156,900,000.00).

The 47th Oklahoma Legislature amended § 301 by Senate Bill 115 (signed by the Governor May 27, 1999) and House Bill 1571, § 39 (signed by the Governor June 10, 1999). The amendments are not material to our disposition.

Unquestionably, provisions obligating future legislatures are unconstitutional. However, here, there is simply nothing to bind future legislative bodies to make the anticipated appropriations. Future revenues are not pledged . . . for retirement of the proposed bonds. The present Legislature's intent to appropriate the monies is not a binding commitment on future legislatures to do so.

*Application of Oklahoma Capitol Improvement Authority, supra,* 958 P.2d at 771.

¶ 9 Further, the two bond resolutions before us each contain a copy of the form of bond to be sold and on the face thereof is contained the following disclaimer:

This bond is not an indebtedness of the State of Oklahoma, nor shall it be deemed to be an obligation of the State ·of Oklahoma and neither the faith and credit nor the taxing power of the State of Oklahoma or any political subdivision thereof is pledged or may hereafter be pledged to the payment of the principal of or the interest on this Bond or the series of which it forms a part. This Bond is not a general obligation of [OCIA] nor a personal obligation of the members of [OCIA], but it is a limited obligation payable solely from the revenues specifically pledged to its payment.

In substance, the two statutes at issue here, and the bonds which they authorize, are indistinguishable from those held valid by this Court on previous occasions. *See Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, *cert. denied* —— U.S. ——, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998); *Application of Oklahoma Capitol Improvement Authority,* 1966 OK 6, 410 P.2d 46; *Application of Oklahoma Capitol Improvement Authority,* 1960 OK 207, 355 P.2d 1028.

¶ 10 Like our previous cases, all the monies bond holders can expect to recover are actual appropriations made by individual legislative bodies. *Application of Oklahoma Capitol Improvement Authority, supra,* 958 P.2d at 772. "If [OCIA] doesn't have monies to retire the bonds, because legislative appropriations are not made, there is nothing for the bondholder to recover." *Id.* at 775. In other words, should future legislative bodies fail to appropriate sufficient funds to retire the bonds, the risk of default is assumed by the bondholders. At most, only appropriation-risk or moral obligation bonds are involved here, not legally enforceable ones, except to the extent each succeeding legislative body actually appropriates funds for their retirement. Furthermore, there is no legally enforceable contract between this State's Legislature and either OCIA, the various agencies, etc. or the citizens of Oklahoma to make the anticipated appropriations necessary to retire the bonds. *Id.* at 776. Simply, no debt or obligation as contemplated by OKLA. CONST. art. 10, §§ 23, 24 and 25 is created against the State if money is not appropriated and, thus, those provisions of our fundamental law are not applicable.[7]

---

7. Taxpayer petitioners also argue that the purchase of bond insurance by the Oklahoma Capitol Improvement Authority (OCIA) from a bond insurance company in relation to the bond proposals at issue here would be unconstitutional as violative of our constitutional balanced budget provisions, would be void because no "insurable interest" exists and might constitute a prohibited gift by the State to purchasers of the bonds in violation of OKLA. CONST. art. 10, § 15. Although this Court has not been provided with any bond insurance policy that will be purchased by OCIA in relation to the two bond proposals involved here, both of the· OCIA bond proposal resolutions adopted on December 18, 1998 indicate that bond insurance with respect to the principal of and interest on the bonds will be purchased from a bond insurance company, if the interest cost savings on all or a portion of the bonds exceed the cost of such insurance. Apparently, under such insurance, the insurer would agree to pay the principal and interest to any bondholder should OCIA default on any payment thereof because of a failure of any succeeding Legislature to appropriate sufficient funds to retire part or all of the payments due under any bonds sold. We do not believe, if purchased, such insurance would constitute a prohibited gift. As noted, the two bond proposal resolutions provide insurance will only be purchased if its cost is less than the interest cost savings on all or a portion of the bonds. Thus, OCIA, the State and the public will reap an economic benefit from the purchase. In such a situation, the purchase of insurance cannot be considered a prohibited gift. See *In The Matter of The Petition of University Hospitals Authority,* 1997 OK 162, 953 P.2d 314, 320–321. We also believe both the State and the bondholders have an insurable interest subject to insurance protection. The

**PART III. BECAUSE NEITHER § 168.3 NOR § 301 ARE REVENUE BILLS THE STRICTURES OF OKLA. CONST. ART. 5, § 33 ARE NOT IMPLICATED.**

¶ 11 Petitioners also contend §§ 168.3 and 301 were passed by the Legislature in violation of one or more of the strictures contained in OKLA. CONST. art. 5, § 33 which provides:

A. All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills.

B. No revenue bill shall be passed during the five last days of the session.

C. Any revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast on the measure at such election and not otherwise, except as otherwise provided in subsection D of this section.

D. Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the people of the state if such bill receives the approval of three-fourths (¾) of the membership of the House of Representatives and three-fourths (¾) of the membership of the Senate and is submitted to the Governor for appropriate action. Any such revenue bill shall not be subject to the emergency measure provision authorized in Section 58 of this Article and shall not become effective and be in force until ninety days after it has been approved by the Legislature, and acted on by the Governor.

Because it is quite plain that neither § 168.3 nor § 301 are revenue bills within the contemplation of OKLA. CONST. art. 5, § 33, we assume for purposes of our disposition of this proposition that both statutes, as petitioners contend, were promulgated without meeting one or more of the strictures contained in § 33.

¶ 12 The accepted definition of a revenue bill falling under § 33 is the two-pronged test set forth in *Leveridge v. Oklahoma Tax Commission*, 1956 OK 77, 294 P.2d 809 *First Syllabus*: "[r]evenue [b]ills are those laws whose principal object is the raising of revenue and which levy taxes in the strict sense of the word, and said phrase does not cover laws under which revenue may incidentally arise." *See also Walters v. Oklahoma Tax Commission*, 1996 OK CIV APP 154, 935 P.2d 398, 401, *cert. denied* —— U.S. ——, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997), *reh. denied* —— U.S. ——, 118 S.Ct. 592, 139 L.Ed.2d 428 (1997)(same) and Ramsey, *What is a 'Revenue Bill' Within the Meaning of Our Most Recent Constitutional Amendment*, 63 Okla. B.J. 1567 (1992). In no sense can either § 168.3 or § 301 be considered a revenue bill controlled by § 33.

¶ 13 The principal object of § 168.3 is to provide adequate and proper facilities for the Oklahoma School of Science and Mathematics. The principal object of § 301 is to provide adequate and proper facilities and/or equipment for various State agencies, departments and/or instrumentalities. More importantly, no tax at all is either levied or authorized to be levied by either enactment. Accordingly, petitioners' assertion that one or more of the strictures of OKLA. CONST. art. 5, § 33 were violated in relation to the passage of §§ 168.3 and 301 is without merit because neither statute is a revenue bill controlled by § 33.[8]

State has a substantial economic interest in being better able to market bonds which are insured, rather than ones which are not insured, and the State obviously has an economic interest in seeing to it that such bonds are faithfully retired. A substantial economic interest of the bondholders exists in the form of protecting the safety and integrity of the money they have loaned to OCIA and insuring it will be paid back. Finally, our constitutional balanced budget provisions would not be violated by OCIA's purchase of a bond insurance policy, so long as no term of the policy creates a binding future obligation

upon the State, such as the State agreeing to reimburse the bond insurance company for payments made by it to some or all of the bondholders because of a default on the part of OCIA to pay the bondholders by virtue of a lack of legislative appropriations. *See Dieck v. Unified School District of Antigo*, 165 Wis.2d 458, 477 N.W.2d 613, 621–622 (1991).

8. We note that our decision in *Application of Oklahoma Capitol Improvement Authority*, 1998 OK 25, 958 P.2d 759, *cert. denied* —— U.S. ——, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998) foreshad-

## PART IV. CONCLUSION.

¶ 14  Neither § 168.3 nor § 301 are unconstitutional as authorizing debt in the constitutional sense because they only allow for the issuance of what are known as appropriation-risk or moral obligation bonds. Oklahoma constitutional balanced budget provisions are, thus, inapplicable. Further, neither provision is a revenue bill controlled by OKLA. CONST. art. 5, § 33 because their principal object is not the raising of revenue, but to provide adequate facilities and/or equipment for State agencies, departments and/or instrumentalities and, more importantly, no taxes are levied or authorized to be levied by either statute. Finally, the two proposed bond issues in the total amount of $165 million dollars sought to be approved by OCIA are valid as authorized by either § 168.3 or § 301.

¶ 15  **ORIGINAL JURISDICTION ASSUMED; 73 O.S. SUPP.1998, § 168.3 AND § 301 AND BOND PROPOSAL ISSUES HELD CONSTITUTIONAL.**[9]

owed an understanding that statutes authorizing appropriation-risk or moral obligation bond measures like that at issue here are not revenue bills within the meaning of OKLA. CONST. art. 5, § 33.  958 P.2d at 762 fn. 5.

**9.**  We note that by this Court's Order filed in this matter on April 20, 1999, we previously denied the December 29, 1998 motion of petitioners for recusal and disqualification of all members of this Court.  That order is to be published contemporaneously with this opinion.

**1.**  The Okla. Const. art. 5, § 33 provides:
"A.  All bills for raising revenue shall originate in the House of Representatives.  The Senate may propose amendments to revenue bills.
B.  No revenue bill shall be passed during the five last days of the session.
C.  Any revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast on the measure at such election and not otherwise, except as otherwise provided in subsection D of this section.
D.  Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the people of the state if such bill receives the approval of three-fourths (¾) of the membership of the House of Representatives and three-fourths (¾) of the

¶ 16  Any petition for rehearing in regard to this matter shall be filed by noon, Tuesday, July 6, 1999.

¶ 17  SUMMERS, C.J., HARGRAVE, V.C.J., HODGES and SIMMS, JJ., concur.

¶ 18  KAUGER and WATT, JJ., concur specially.

¶ 19  LAVENDER, J., concurring in part; dissenting in part.

¶ 20  OPALA and ALMA WILSON, JJ., dissenting.

¶ 21  As to ¶ 16 of opinion—HARGRAVE, V.C.J. and OPALA, J., not voting.

¶ 1  KAUGER, J. with whom SUMMERS, C.J. and WATT, J. join, concurring specially:

¶ 2  I agree with the majority that the proposed bond issues are constitutional within the meaning of the Okla. Const. art. 5, § 33[1] and art. 10, §§ 23,[2] 24[3] and 25.[4] I also acknowledge that the language contained in

membership of the Senate and is submitted to the Governor for appropriate action.  Any such revenue bill shall not be subject to the emergency measure provision authorized in Section 58 of this Article and shall not become effective and be in force until ninety days after it has been approved by the Legislature, and acted on by the Governor."

**2.**  The Okla. Const. art. 10, § 23 provides in pertinent part:
"The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of the form, or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma. . . ."

**3.**  The Okla. Const. art. 10, § 24 provides in pertinent part:
"In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war . . ."

**4.**  The Okla. Const. art. 10, § 25 provides in pertinent part:
"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized

the legislative enactments relating to the bond proposals is characteristic of that found in moral-obligation or appropriation-risk bonds. However, these bond proposals are not protected from attack merely through artful drafting. It is unnecessary to determine the character of the obligation created because these are traditional, self-liquidating proposals historically upheld by this Court's jurisprudence. *Stare decisis* demands their approval.

¶ 3 The majority opinion recognizes that the bonds are intended to fund "building projects for the Oklahoma School of Science and Mathematics" and other "projects ranging from construction of a new building for the J.D. McCarty Center for Children with Developmental Disabilities to the purchase of computer hardware and software for the Oklahoma Department of Central Services."[5] These are precisely the types of projects this Court has traditionally found constitutional under the Okla. Const. art. 10, §§ 23, 24 and 25.

¶ 4 In *Application of Oklahoma Capitol Improvement Auth.*, 1966 OK 6, 410 P.2d 46, and *Application of Oklahoma Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, 1031, we characterized bonds for state office buildings as self-liquidating because the Legislature appropriated to the tenant state agencies monies sufficient to pay the rent which would amortize the bonds. Although no revenues derived from sources outside state appropriations were involved, the 1960 Court found that the bonds for state office buildings were self-liquidating. In both cases, "self-liquidating" entailed putting enough state dollars in one pocket to support the rental payments which had to be made from the other pocket. The construction

projects here, like those at issue in *Application of Oklahoma Capitol Improvement Auth.*, 1966 OK 6, 410 P.2d 46, and *Application of Oklahoma Capitol Improvement Auth.*, 1960 OK 207, 355 P.2d 1028, 1031, involve arrangements where state buildings are rented by state agencies pursuant to multi-year leases — scenarios approved in both the causes and identical to that of the capital and construction projects provided for in 73 O.S. Supp.1998 § 301.[6]

¶ 5 To the extent that the bond proposal provides for the purchase or upgrade of computer or other equipment, its constitutionality is also supported by our prior decisions. In *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, 1195, we upheld a lease covering communications switching equipment. In *Indiana Nat'l Bank v. State Dept. of Human Services*, 1993 OK 101, 857 P.2d 53, 57, a lease for computer equipment was held constitutional against a debt-limitation attack.

¶ 6 The existence of language in the statute and in the bond proposals which might be construed as merely creating a moral obligation of their payment is irrelevant to the holding that the bonds do not create a prohibited debt within the meaning of the Okla. Const. art. 10, §§ 23, 24 and 25. Approval of the bonds is required based on Oklahoma's constitutional and statutory law and our controlling precedents — all of which provide bona fide, separate, adequate and independent grounds for this decision.[7]

LAVENDER, J., concurring in part; dissenting in part, with whom OPALA and ALMA WILSON, JJ., join:

¶ 1 I concur in the majority opinion to the extent it holds neither 73 O.S. Supp.1998,

---

by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election...."

5. See, ¶ 7, majority opinion. Subsection A(13) of 73 O.S. Supp.1998 § 301 provides for a maxi-

mum of $3 million for the implementation of the Boll Weevil Eradication Act with debt retirement payments to be made by the Department of Agriculture. However, this program provides an avenue for economic support through self-assessments on cotton growers. See, 2 O.S. Supp. 1997 §§ 3–50.9, 3–50.9a, 3–50.10 and 3–50.11.

6. Title 73 O.S. Supp.1998, § 301, see majority opinion, note 8, supra.

7. *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).

§ 168.3 nor 73 O.S. Supp.1998, § 301 are controlled by the strictures of OKLA. CONST. art. 5, § 33. The statutes before us, as the majority opinion correctly holds, are not revenue bills within the meaning of § 33. They are not revenue bills governed by § 33 for the simple reason no taxes are levied or authorized to be levied by either statute. *See Leveridge v. Oklahoma Tax Commission*, 1956 OK 77, 294 P.2d 809 First Syllabus. Only statutes which levy taxes in the strict sense are considered revenue bills controlled by § 33. *Id.*

¶ 2 I must, however, dissent to the majority's holding that §§ 168.3 and 301do not violate OKLA. CONST. art. 10, §§ 23 and 25, Oklahoma's constitutional balanced budget provisions. I believe the statutes and the bonds which they authorize are unconstitutional because together they authorize massive borrowing (over $300 million dollars) by the State of Oklahoma and the legislative body authorizing the borrowing had every intent of binding future legislative assemblies to repay the money borrowed. In my opinion, such borrowing, with an express legislative intention to repay from future legislative appropriations, falls well within the confines of prohibited debt forbidden by this State's balanced budget provisions, in the absence of approval by Oklahoma's voters at the polls. To sanction this massive borrowing is to mortgage the futures of succeeding generations of Oklahomans—i.e. this State's children and grandchildren—for present expediency and is nothing less than deception by artful subterfuge or sophistry. Future generations should not be saddled with this debt until and unless they or their parents vote to sanction it, as is required by our fundamental constitutional law.

¶ 3 As I said last year in my dissent in *Application of Oklahoma Capitol Improvement Authority*, 1998 OK 25, 958 P.2d 759, 763, *cert. denied* —— U.S. ——, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998) when this Court is called upon to construe "the provisions of the Oklahoma Constitution, we must give effect to the intent of its framers and of the people who adopted it." 958 P.2d at 778 (Lavender, J. dissenting), relying on *Boswell v. State*, 181 Okla. 435, 74 P.2d 940, 942 (1937). Fur-

ther, when a constitutional provision is unambiguous, courts are not at liberty to search for its meaning beyond the instrument itself. *Id.* The words of any constitutional provision must be given their ordinary and natural meaning. The intent of OKLA. CONST. art. 10, § 23, coupled with OKLA. CONST. art. 10, § 25, is that Oklahoma governmental projects—including the projects authorized by §§ 168.3 and 301—are to be funded on a cash basis, i.e. on a fiscal year plan, and that long-term State debt reaching beyond the fiscal year may only be incurred by a vote of the people at the polls, including approval of some type of direct annual tax sufficient to pay the principal and interest on such a debt. 958 P.2d at 778–779 (Lavender, J., dissenting). Here, we have such long-term debt, but no vote of the people and no specification of any direct annual tax to pay for the debt. In plain and simple terms, §§ 168.3 and 301 were intended to violate, and have the effect of offending, our constitutional debt-limitation provisions. I am unable to give my approval to such a disregard of our fundamental law.

¶ 4 The majority says the massive borrowing, which will be paid back by subsequent fiscal year appropriations, is not debt in the constitutional sense because the bonds authorized by §§ 168.3 and 301 are merely what are known as appropriation-risk or moral obligation bonds, i.e. there is no commitment that binds future legislative assemblies to repay the bondholders. I do not agree.

¶ 5 Although this Court is not authorized to delve into the wisdom, need, or desirability of a legislative enactment [*Oklahoma Industries Authority v. Barnes*, 1988 OK 98, 769 P.2d 115, 119], we are authorized to look at, in fact we must look at, what the Legislature intended by its legislative provision. *Oklahoma Ass'n for Equitable Taxation v. City of Oklahoma City*, 1995 OK 62, 901 P.2d 800, 803, *cert. denied* 516 U.S. 1029, 116 S.Ct. 674, 133 L.Ed.2d 523 (1995)(determination of intent controls statutory interpretation). To ascertain what the Legislature intended, one should look to the language of the statutes under review and presume the legislative body intends what it expresses. *Affiliated*

*Management Corp. v. Okla. Tax Com'n*, 1977 OK 183, 570 P.2d 335, 337. Further, words in a statute are given their plain and ordinary meaning (just as with constitutional provisions), except when a contrary intention plainly appears [*In re Guardianship of Campbell*, 1966 OK 99, 450 P.2d 203, 206] and the words of a statute should generally be assumed to be used by the law-making body as having the same meaning as that attributed in ordinary and usual parlance. *Matter of Income Tax Protest of Ashland Exploration, Inc.*, 1988 OK 23, 751 P.2d 1070, 1073. Finally, this Court recognized over sixty (60) years ago that, whether a statute authorizes a debt of the State contrary to our constitutional balanced budget provisions is a judicial question and not a legislative one. *Boswell v. State, supra,* 74 P.2d at 943.

¶ 6   When I read §§ 168.3 and 301 it is obvious to me from the plain language used by the legislative body that it was intended by those statutes to create a debt. **A review of §§ 168.3 and 301 reveals that the following words or phrases—"indebtedness", "indebtedness created", "debt created", "debt retirement", "obligations" and "debt service"—are used in those legislative enactments a total of thirty-eight (38) times to refer to the bonds which are authorized to be sold by the Oklahoma Capitol Improvement Authority (OCIA) or to the bonds' repayment.** Further, both statutes contain a direct expression of legislative intent to appropriate sufficient monies to retire the **debt or obligations** authorized to be created. § 168.3(B) and § 301(B). Without a vote of the people and their sanction of a direct annual tax to pay off a multi-year debt as required by OKLA. CONST. art. 10, § 25, multi-year **debts or obligations** are strictly forbidden by OKLA. CONST. art. 10, § 23, in the following pertinent language:

> **The state shall never create or authorize the creation of any debt or obligation,** or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this

section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.[1] (emphasis added)

¶ 7   The plain and ordinary meaning of the terms debt and obligation are as follows: debt is "something owed"; obligation is "a commitment (as by a government) to pay a particular sum of money". WEBSTER'S NEW COLLEGIATE DICTIONARY 289 and 785 (1979). Giving such terms their plain and ordinary meanings it is beyond question, at least in my view, that §§ 168.3 and 301 were intended by the Legislature to authorize the creation of debts or obligations, i.e. to exhibit a commitment to have future legislative bodies appropriate monies to pay off the holders of any bonds sold. In my opinion, no amount of legal semantics, word-massaging or linguistic subterfuge can turn this express commitment into some non-enforceable moral obligation to repay. To rule otherwise this Court must hold the Legislature does not mean debt when it says debt, does not mean obligation when it says obligation, and does not mean indebtedness when it says indebtedness. I am unwilling to engage in such interpretative gymnastics because to do so would ignore the plain meaning of the statutes before us and would disregard the obvious reality that future legislatures will appropriate monies to pay back the millions of dollars borrowed from the bondholders.

¶ 8   I also must distinguish the situation evident in the instant matter from those cases where this Court has approved multi-year leases of office equipment that were subject to termination on a year-to-year basis if insufficient legislative appropriations are made to make any particular year's lease payments. *See Indiana Nat. Bank v. State Dept. of Human Services,* 1993 OK 101, 857 P.2d 53; *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs,* 1987 OK 43, 737 P.2d 1191. In the multi-year lease cases, if insufficient legislative appropriations are made, the equipment is merely returned to the lessor, the lease is at an end and no further payments are due to the lessor.

---

1.   OKLA. CONST. art. 10, § 24 authorizes the State to contract debts to repel invasion, to suppress insurrection or to defend the State in war.

No one argues the applicability of that provision in this case and it is obviously inapplicable to the statutes and bonds currently subject to review.

Here the State, through OCIA, is purchasing equipment and land, and constructing buildings and other facilities that will immediately be owned by the State. Such equipment and facilities cannot merely be given back to a lessor or vendor upon default in paying the bondholders and have the debt created in favor of the bondholder come to an end. Here the debt owed to the bondholders remains until it is repaid.

¶ 9 Further, although some of the projects funded by the monies generated from sale of the bonds involved here might generate sufficient revenue to be considered self-liquidating under our previous jurisprudence[2] no attempt has been made in the legislation before us to identify such projects. Instead, the enactments at issue, in express terms, rely on general revenue legislative appropriations to pay back the money borrowed from the bondholders. I, therefore, find the following language from Justice Opala's dissent in *Application of Oklahoma Capitol Improvement Authority, supra*, to state my view as to why the situation here cannot be considered to be self-liquidating:

> The undeniable fact in the scheme used here for repayment is that there is a total reliance on legislative appropriations. The project cannot generate any tangible revenue of its own. There is no possibility of repayment without dependence on annual legislative appropriations. This alone prevents the proposed transaction from qualifying as a 'self-liquidating' project's obligation.

958 P.2d at 781. As Justice Opala also correctly pointed out in the same dissent, the state is simply not authorized to accept—without an antecedent approval by a vote of the people—the proceeds of a loan that will not pass muster as a "self-liquidating" project's obligation. *Id.* at 779.

¶ 10 The sanctioning of the instant bond issue and the Court's approval of the highway bond issue last year in *Application of Oklahoma Capitol Improvement Authority, supra*, have completely obliterated our fundamental balanced budget provisions. The Court has now, in essence, given its approval to over $450 million in debt that will be paid back out of future general revenue legislative appropriations without a vote of the people as required by our Constitution. How many hundreds of million dollars more will be borrowed in this manner before it is realized the legislation before us, or that of a similar ilk, creates a debt in contravention of Oklahoma's constitutional fabric? The answer, I fear, lies in the prediction of my colleague, Justice Watt, when in dissent to the denial of rehearing in *Application of Oklahoma Capitol Improvement Authority, supra*, the highway bond case, he stated in the following language:

> The majority ... by its vote today, sanctions the State's use of long-term debt financing without a vote of the people. The actions of the Legislature—and of the majority of this Court in ratifying them—do not simply whittle away at the clear protecting mandates of Article 10, §§ 23 and 25 of the Oklahoma Constitution, their actions gut the State's balanced budget amendments. Pursuant to the majority's rationale, the State will never create a legally binding obligation against itself if it issues bonds that contain certain "magic" language disavowing the creation of any such debt, regardless of the economic realities of the situation. No decision of this Court should rest upon such a fallacy.

What is particularly disturbing about the ratification of the current bond issue is that this is just the tip of the iceberg. Our citizenry would be well advised to prepare for future large-scale deficit financing of capital projects by State officials. Approximately two-thirds of the on-going one billion dollar road improvement legislation will be financed via these so-called "moral obligation" bonds. There is evidence in the record that suggests similar bonds for prison construction is next. The majority's decision will serve as no legal impediment for the issuance of "moral obligation" bonds for any capital improvement project.

---

2. *See e.g. Baker v. Carter,* 165 Okla. 116, 25 P.2d 747 (1933)(dormitory bonds to be retired from rents and fees paid by student users).

The taxpayers will eventually be called upon to foot the bill. (emphasis in original) 958 P.2d at 795.

¶ 11 Indeed, the taxpayers will foot the bill—without their approval as required by the clear, unambiguous and plain meaning of our fundamental law. I cannot sanction such a result and, therefore, dissent to that part of the majority opinion holding that §§ 168.3 and 301do not violate OKLA. CONST. art. 10, §§ 23 and 25, Oklahoma's constitutional balanced budget provisions.

### WATT, J. concurring specially:

¶ 1 I join Justice Kauger in her specially concurring opinion. I write, however, to make clear my conclusion that my dissent in *In Re: Oklahoma Capitol Improvement Authority,* 1998 OK 25 ¶¶ 1–2, 958 P.2d 759, has nothing to do with the facts of the case at bar.

¶ 2 Although Justice Lavender has cited to my dissent in *Oklahoma Capitol Improvement Authority* at ¶ 10 of his opinion concurring in part and dissenting in part, I do not believe that my analysis in my dissent applies here. I dissented there because the roads being financed by the bonds in that case produced no revenues with which the bonds could be repaid. Here, however, as Justice Kauger observed in her specially concurring opinion, at ¶ 2, "It is unnecessary to determine the character of the obligation created because these are traditional, self-liquidating proposals historically upheld by this Courts jurisprudence. *Stare decisis* demands their approval." For this reason I believe there is ample authority other than

*Oklahoma Capitol Improvement Authority* supporting the conclusion that the bonds at issue here are constitutional. Thus, I see no reason to dissent to the majority opinions approval of the bonds at issue here and decline to do so.

### ALMA WILSON, J., with whom LAVENDER and OPALA, JJ., join, dissenting:

¶ 1 The Oklahoma Capitol Improvement Authority may not borrow money that is to be repaid via legislative appropriations over a number of years unless the voters of Oklahoma have approved the law authorizing the debt.[1] Very simply, the Legislature stands accountable to the people before a debt-authorizing statute may be carried out. I cannot turn away the people's constitutional right to vote for or against the statutes before us today.[2] Accordingly, I respectfully dissent to the approval of the instant bond proposals for all the reasons set forth in my dissenting opinions in *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, 782, and 795, *cert. denied,* — U.S. —, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998). Further, I would allow at least ten days within which rehearing may be sought.

### OPALA, J., receding from the court's opinion and joining the dissenting view by LAVENDER, J.

¶ 1 I recede from today's pronouncement for the reasons expressed in *Application of Oklahoma Capitol Improvement Authority* (Opala, J., dissenting)[1] and join the dissenting view by Lavender, J.

---

1. The Oklahoma Constitution, art. 10, § 25 provides that "no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object," ... and "(n)o such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election."

2. Neither 73 O.S.Supp.1998, § 168.3, authorizing 6 million dollars in bonds for the Oklahoma School of Science and Mathematics, nor 73 O.S.Supp.1998, § 301, authorizing a total of 320 million dollars in bonds for a variety of state projects, have been submitted to a vote of the people. The Legislature has had nearly 8 years to submit the statute authorizing the 6 million dollar bond issue to a vote of the people. It was originally enacted by 1991 Okla. Sess. Laws, ch. 270, § 37, with a declared effective date of July 1, 1991. And, the Legislature could have submitted the statute authorizing the issuance of 320 million dollars of bonds to a vote of the people at our general election in 1998. That statute was originally enacted by 1998 Okla. Sess. Laws, ch. 372, § 1, with a declared effective date of September 1, 1998.

1. 1998 OK 25, 958 P.2d 759, 779–82, *cert. denied* — U.S. —, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998).

## ORDER

¶ 1 Original jurisdiction is assumed as to the issue of disqualification of all of the Justices of the Oklahoma Supreme Court, with other merit issues to be subsequently considered. The interest of the individual Justices in a Capitol Improvement Bond Issue, including bonds for new judicial facilities, is too speculative and insubstantial to constitute an interest in the outcome of this cause, involving the legality of that bond issue, to require disqualification of any or all of the Justices. *Commonwealth of Northern Mariana Islands v. Kaipat*, 94 F.3d 574 (9th Cir.1996).

¶ 2 DONE BY THE ORDER OF THE SUPREME COURT IN CONFERENCE THIS 19th DAY OF April, 1999.

¶ 3 HARGRAVE, V.C.J., HODGES, LAVENDER, SIMMS, WILSON, KAUGER and WATT, JJ.—concur.

¶ 4 OPALA, J.—Concurs in result.

OPALA, J., with whom KAUGER, J., joins only insofar as the rule of necessity is invoked in Parts III and IV, concurring in result.

¶ 1 Challenged is the validity of bonds to be issued. Some of these will be used for renovation of the State Historical Building slated for occupation by the Supreme Court. Petitioners move that all the justices disqualify because they will benefit from having new quarters. I conclude that, although subject to recusal, the court's justices must nonetheless decline to step down by invoking the rule of necessity.

### I

## THE U.S. CONSTITUTION COMMANDS A NEUTRAL AND DETACHED JUDICIARY

¶ 2 Ever since *Tumey v. Ohio*,[1] a tribunal's *impartiality* has been a *sine qua non* element of due process within the meaning of the Fifth and Fourteenth Amendments.[2] Judges must be not only *neutral* but also *detached*. These prerequisites preserve both the reality and appearance of fairness.[3] Lack of financial interest in the outcome of a case is *not the sole indication* of a court's fitness. Judges must also be free from an intellectual or emotional commitment that would indicate *a predilection* for or against a given resolution of the controversy at hand.[4]

### II

## DISPASSIONATENESS IS AN INDISPENSABLE PREREQUISITE FOR A DETACHED PROCESS OF ADJUDICATION

If one's *economic interest were the sole test of a judge's neutrality and detachment*, I would accede to the court's characterization of the justices' interest in this case as, at best, *de minimis*, speculative, and remote. What the analysis in today's order plainly disregards is that a tribunal's *dispassionateness* constitutes a *sine qua non* component of the fundamental law's standard of fairness in adjudication.[5] In order to administer judicial process without the taint of prejudice,[6] a

1. See *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927).

2. Chief Justice Taft, relying on the common law of England, recognized as a fundamental principle of due process that judicial officers be disqualified by their interest in a controversy to be decided. *See id.*, 273 U.S. at 522–23, 47 S.Ct. at 441 (citing *Dimes v. Grand Junction Canal*, [111] H.L.C. 759); *see also Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 617, 113 S.Ct. 2264, ,2277, 124 L.Ed.2d 539 (1993); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986); *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972); *Bartkus v. People of Illinois*, 359 U.S. 121, 128, 79 S.Ct. 676, 680, 3 L.Ed.2d 684 (1959).

3. *See Marshall v. Jerrico, Inc.* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182; *see also Ward v. Village of Monroeville*, 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972).

4. See Karl Georg Wurzel, *Methods of Juridical Thinking* in William R. Bishin & Christopher D. Stone, Law, Language & Ethics 883–84 (University Casebook Series, 1972).

5. *See Wurzel, supra* note 4.

6. See Okla. Const. Art. 2, § 6 which provides that "justice shall be administered without ... prejudice."

judge must "think dispassionately and submerge private feeling on every aspect of a case."[7]

¶ 4 The U.S. Constitution's due process gauge of impartiality for a tribunal's adjudicative fitness is encapsulated in the eloquence of the text that follows:

But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true ... denies the latter due process of law.' *Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.*[8]

¶ 5 No less rigid is the standard-of-fairness test required for judicial officers by the commands of Article 2, section 6 of the Oklahoma Constitution:[9]

Every litigant is entitled to nothing less than the cold neutrality of an impartial judge.[10]

It is the duty of courts to scrupulously guard our constitutional rights to a speedy trial without prejudice, *and a judge should refrain from trying to exercise jurisdic-*

*tion in any matter where his qualification to so do is seriously brought in question. The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.*[11]

¶ 6 The justices have not been challenged in this case for having a personal *financial* interest in the approval of the proposed bonds. The court admittedly has no known identification with, or involvement in, the business aspects of the transaction to be approved. Rather, the interposed challenge is to each of the individual justice's detachment. It is rested on our *lack of dispassionateness* alleged to stem from the court's stake in its opportunity to benefit from upgraded judicial facilities.

¶ 7 *I cannot deem myself dispassionate* when the outcome of the case affects my cherished status symbol—the chambers in which my work is performed. Accommodations are a very important part of one's status in society. In contemporary American culture a private bathroom in one's executive suite of elegantly appointed offices is a symbol as well as a mark of achievement on the corporate ladder. I will not deny that this corporate culture has permeated the walls and corridors of the judiciary. In short, I cannot ignore my "stake" in the outcome of this case. To do otherwise would be to throw candor to the winds and to *counteroffer a mere pretense* that the lure of elegantly appointed chambers, each with a private bathroom, counts for absolutely nothing when weighed against my self-advanced profession of virginal detachment.[12]

---

7. *Public Utilities Commission v. Pollak,* 343 U.S. 451, 466, 72 S.Ct. 813, 822, 96 L.Ed. 1068 (1952) (Frankfurter, J., expressly taking no part in the decision).

8. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (*citing Tumey v. Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927) and *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)) (emphasis supplied and citations omitted).

9. See *supra* note 6 for the pertinent provisions.

10. *State v. Sullivan,* 207 Okl. 128, 248 P.2d 239, 244 (1952).

11. *Id.* (emphasis supplied).

12. See *id.,* where it is stated:

To force the petitioner to trial in face of the fear that the suggestions for disqualification warrant[s] would be to impose on him a condition contrary to every principle devised for the administration of justice under our jurisprudence. *There may in reality be little basis for his fear but if it's there, the renunciation of the trial judge won't efface it.*
(emphasis supplied).

¶ 8 The prospect of a sure gain, however much misperceived as something that is one's due, will invite a preference in any set of competing alternatives. This behavioral pattern is driven by human instinct. To proclaim its eradication by a professionally cultivated taste for (or habit of) voluntary suppression, or to rest the case against recusal on a categorical self-denial, will not bring honor to, or respect for, those who are in the service of judging. Public confidence in judicial impartiality has to be anchored in a faith-inspiring pedestal of much greater solidity. Not even the mighty pen of my colleague writing today in unqualified support for the court's order can convincingly repeal man's nature by his *ipse dixit*.

## III

## EN BANC RECUSAL OF THE JUSTICES WOULD OPEN THE DOOR FOR A GUBERNATORIAL APPOINTMENT OF SUCCESSORS

¶ 9 If a justice of the Oklahoma Supreme Court disqualifies from participation in a case, the Chief Justice assigns a state judicial officer to act in the place of the recused incumbent.[13] *Upon recusal of all the justices,* it is the duty of the Governor to appoint qualified members of the state bar to fill the vacant seats as "special justices".[14]

¶ 10 All of the justices have been challenged here for the same reason. Upon their recusal the Governor, though a litigant [15] in this cause, would have statutory authority to exercise his power of appointment. The persons so appointed are likely to be challenged as having received title from one who was not fit to confer it. Although the Governor does not necessarily have to be neutral, we cannot allow the judicial process to sink below its constitutional minimum *by inviting the Chief Executive to, in effect, select his own court. It is a venerable common law adage that no litigant can appoint his own judges.*[16]

## IV

## THE RULE OF NECESSITY COMMANDS THAT THE JUSTICES NOT RELINQUISH THEIR POSTS

¶ 11 The "rule of necessity," a well-established common-law principle, requires a judge to remain in a case, regardless of the judge's interest in the outcome, if the sole power to decide the controversy resides in him.[17] Where, as here, there exists no constitutionally *credible* provision for post-recusal filling of vacant seats, the justices have a *duty* to decide the controversy notwithstanding their imputed lack of impartiality.[18]

¶ 12 The rule of necessity governs this case not because there is no replacement mechanism but because the exercise of that mechanism,[19] controlled by one who is a party to the lawsuit, would be clouded by grave fundamental-law infirmity. Even if the Governor were to defeat a challenge to his appointment power, the law could not sanction his functioning *in this case* in a dual capacity—as both litigant and judge.[20] The appoint-

13. See 20 O.S.1991 Ch. 1, App. 2, Rule 9(b); Okla. Const. Art. 7, §§ 6, 8(i).

14. See 20 O.S.1991 Ch. 1, App. 2, Rule 9(c); 20 O.S.1991 § 1402.

15. *The Governor, as the Chairman of the Oklahoma Capitol Improvement Authority, is a litigant in this case.*

16. *Nemo Potest Esse Simul Actor et Judex.* No one can be at once a suitor and a judge. Broom, Max. 117. *Nemo Agit in Seipsum.* A man cannot be a judge and a party in the same case. Broom, Max. 216n. *Nemo debet esse judex in propia causa.* No man ought to be a judge in his own cause. See Black's Law Dictionary 935, 936 (5th ed.1979). Lord Campbell recognized that "it is of the last importance that the maxim that no man is to be a judge in his own cause should be held sacred. And that is not to be confined to a cause in which he is a party, but applies [also] to a cause in which he has an interest." *Dimes v. Grand Junction Canal,* 111 H.L.C. 759, 793 (1852).

17. *See United States v. Will,* 449 U.S. 200, 213, 101 S.Ct. 471, 480, 66 L.Ed.2d 392 (1980); *Southwestern Bell Telephone Co. v. Oklahoma Corp. Comm'n,* 1994 OK 38, ¶ 24 n. 87, 873 P.2d 1001, 1023 n. 87 (1994) (Opala, J., dissenting).

18. *See Will,* 449 U.S. at 214, 101 S.Ct. at 480.

19. *See supra* note 14.

20. *See supra* note 15.

ment power of the Chief Justice [21] would likewise be tainted as all justices are challenged as having the same interest in the litigation. We must hence remain on the bench to prevent that vacuum which would be filled by persons with a constitutionally clouded status.

## V

## SUMMARY

¶ 13 It is my firm view that I do have a stake in the outcome of this case and am hence subject to the petitioner's quest for disqualification. *Recusal of all justices would precipitate the Governor's appointment of pro tempore justices to hear the Chief Executive's own cause.* My recusal would allow the Chief Justice to choose my replacement. He, like the Governor, would be disqualified to select my successor. By the law's clear command of the rule of necessity, *all the justices* must decline to relinquish their seats and be available to decide whether the bonds should be approved or the challenge to their validity sustained.

### SIMMS, J., CONCURRING:

¶ 1 I most respectfully disagree with my colleague, Justice Opala, when he opines that each and every Justice on this Court is disqualified in this bond case simply because of the potential for improved chambers if and when these bonds are marketed, and the funds from the bond sale for a new and improved courts building become an actuality. I dare say my colleague speaks only for himself and not for the other members of this Court in his thoughts about the desirability and importance of a private bathroom. The grounds for disqualification urged by Justice Opala are more imagined than real, for it is my observation that Justice Opala is the only member of this Court who is passionate about having a bathroom in his chambers.

¶ 2 There is nothing new or novel about a judge or justice having private bathroom facilities. Indeed, when the Tulsa County Courthouse was dedicated in about 1954, that courthouse was designed with private bathroom facilities for each judge's chambers. A visit to many of the older courthouses in Oklahoma will reveal the judge has access to private facilities.

¶ 3 This Justice, due to the passage of time between planning and occupancy of a new court building, will never occupy the new or remodeled building, and therefore has no thoughts of sugar plums dancing in his head. Even casual study of the current court shows this observation applies to other Justices as well.

¶ 4 Although I do not believe Fent has established any ground for the disqualification of any of the Justices or any Justice of this Court, I agree with my brother Opala, that if, arguendo, this Court were disqualified, the Rule of Necessity would come into focus. Certainly, the Governor could not name the court in a case in which he is a litigant. There is no other statutory or constitutional authority existing by which any substitute tribunal could be named.

¶ 5 I am authorized to state that Justice Kauger and Justice Watt join with the views expressed herein